483 F.2d 384
 83 L.R.R.M. (BNA) 2872, 71 Lab.Cas. P 13,856,
1973-2 Trade Cases 74,608
 INTERNATIONAL ASSOCIATION OF HEAT AND FROST INSULATORS AND
ASBESTOS WORKERS, ETC., et al., Appellants,
v.
UNITED CONTRACTORS ASSOCIATION, INC. OF PITTSBURGH,
PENNSYLVANIA, a corporation, and Associated Trades
and Crafts Union, Appellees.
 No. 71-1947.
 United States Court of Appeals,
Third Circuit.
 Submitted Oct. 5, 1972.
Decided July 17, 1973.
 
 Daniel W. Cooper, Stanford A. Segal, Gatz, Cohen & O'Brien, Pittsburgh, Pa., for appellants.
 Timothy P. O'Reilly, Bridgeville, Pa., for appellee United Contractors Assn.
 Burton C. Duerring, Pittsburgh, Pa., for appellee Associated Trades & Crafts Union.
 Before SEITZ, Chief Judge, and FORMAN and HUNTER, Circuit Judges.
 OPINION OF THE COURT
 FORMAN, Circuit Judge.
 
 
 1
 International Association of Heat and Frost Insulators and Asbestos Workers; Local Asbestos Workers No. 2, AFL-CIO by Fred Rust, Jr., an officer of said union on its behalf and its members filed a complaint in the United States District Court for the Western District of Pennsylvania. Twenty-seven other unions joined in it, each represented by an officer and the members of the respective unions. (They are referred to herein as the "Unions"). They are all locals of AFL-CIO in various trades, such as plumbers, masons, et cetera. They named as defendants the United Contractors Association, Inc. of Pittsburgh, Pennsylvania (hereinafter called the "Association"), and Associated Trades and Crafts Union (hereinafter called "Trades and Crafts Union").
 
 
 2
 The complaint asserts that the Association is a Pennsylvania corporation with an office in Pittsburgh, purporting to represent, for trade association and collective bargaining purposes, members engaged in interstate commerce in the construction industry which they conduct in various counties of the Western District of Pennsylvania; that the Trades and Crafts Union is an unincorporated association purporting to represent, for collective bargaining purposes, employees in the construction industry in the same area, which also maintains an office in Pittsburgh.
 
 
 3
 The complaint alleges that the Association and the Trades and Crafts Union have entered into a conspiracy and have created combinations for the purposes of restraining trade in interstate commerce and in eliminating competition in the construction industry in the Western District of Pennsylvania; that an object of the illegal combination and conspiracy is to prevent the Unions from representing for collective bargaining purposes employees of the members of the Association and thus to obtain a competitive advantage over employer parties to collective bargaining agreements with the Unions; that in furtherance of the conspiracy to restrain trade and eliminate competition, a scheme was developed whereby the Association was organized with the color of authority to act as bargaining representative for its employer members; that the conspiracy was carried out by the Association in organizing and supporting the Trades and Crafts Union, and that funds to carry out the activities of the Trades and Crafts Union are supplied by the Association through its members by the payment of dues, fines and other items for employees compelled by the Association to be members in the Trades and Crafts Union; that the Association and the Trades and Crafts Union have executed sham collective bargaining agreements, the purpose of which is to permit the employer members of the Association to conduct their business activities free from interference by the 28 unions, to use the agreements to bar organizational efforts undertaken by the Unions and to prevent their employees from becoming members of the Unions.
 
 
 4
 It is further alleged in the complaint that membership in the Association automatically entitles an employer to membership in the Trades and Crafts Union; that through this dual membership the Association is able to control the activities of both organizations and to destroy competition and restrain trade in the construction industry; that through the conspiracy as above alleged, the Association and the Trades and Crafts Union have prevented the Unions from organizing and representing employees of the members of the Association and have prevented the Unions from performing their rights and duties as duly recognized bargaining representatives of employees engaged in interstate commerce in the building and construction industry.
 
 
 5
 Finally, it is alleged that through the unlawful conspiracy members of the Unions have been unlawfully denied the right to work and earn wages in the building and construction industry jobs obtained by the members of the Association by reason of the unlawful competitive advantage over employers operating under bona fide collective bargaining agreements with the Unions; that the Association and the Trades and Crafts Union have continued from the inception of their organizations to date in the form of unlawful financial assistance, sham collective bargaining agreements, mutual officers, directors and members and mutual control of the activities of both the Association and the Trades and Crafts Union, and that they will continue their conspiracy and conduct to the irreparable injury of the Unions.
 
 
 6
 The Unions pray for money damages in a sum unliquidated in nature at the institution of the action, trebled in amount pursuant to Rule 30 of the District Court of the Western District of Pennsylvania, together with reasonable attorneys' fees and costs and an injunction restraining the Association and the Trades and Crafts Union from various activities alleged to comprise the conspiracy designed to eliminate, avoid or destroy competition in interstate commerce.
 
 
 7
 Association and Trades and Crafts Union attack the complaint by way of motions to dismiss. Association grounded its motion on the failure of the complaint to state a claim against it upon which relief could be granted and that the allegations of conspiracy and acts in furtherance thereof are all based on alleged violations of the National Labor Relations Act as amended which are within the exclusive jurisdiction of the National Labor Relations Board.
 
 
 8
 Trades and Crafts Union based its motion (1) on lack of jurisdiction in the court over the subject matter since all allegations of the complaint charge violation of the Labor Management Relations Act, subject matter exclusively cognizable by the National Labor Relations Board; (2) that the Clayton Anti-Trust Act supplementing the Sherman Act specifically provides that labor organizations or members thereof shall not be held to be illegal combinations or conspiracies in restraint of trade under the anti-trust laws; and (3) that the complaint fails to state a claim upon which relief can be granted.
 
 
 9
 Upon the filing of briefs by the parties and a hearing, the District Court filed an opinion dismissing the complaint, 331 F.Supp. 1298.
 
 
 10
 The District Court carefully reviewed many of the cases which consider the knotty question of when its jurisdiction is preempted by the doctrine of primary jurisdiction in the National Labor Relations Board.[1] Among other things it held:
 
 
 11
 "In providing immunity for activities which are encouraged or protected by the labor laws from the application of the antitrust laws, the Congress has expressly furnished the judiciary with guidelines for the preservation of the policies of the labor laws. Afforded these guidelines, then, there is no need to apply the preemption principles of Garmon, [359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775], and Lockridge, [403 U. S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473]. Rather, the accommodation process should be controlled, as suggested in Allen Bradley Co. v. Local Union No. 3, 325 U.S. 797, 65 S.Ct. 1533, 89 L. Ed. 1939 (1945), by the determination of, '. . . how far Congress intended activities under one of these policies to neutralize the results envisioned by the other.'
 
 
 12
 "Conclusively, this seems to be the clear and controlling import of Local Union No. 189, Amalgamated Meat Cutters of North America v. Jewel Tea Co., 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965). In that case the Supreme Court squarely resolved in the negative, the question of,
 
 
 13
 "'[W]hether a claimed violation of the Sherman Antitrust Act which falls within the regulatory scope of the National Labor Relations Act is within the exclusive primary jurisdiction of the National Labor Relations Board.'
 
 
 14
 "Thus, the jurisdiction of this Court to entertain the instant action is not preempted by the doctrine of primary jurisdiction and we turn to determine whether or not the alleged activities are substantively immune from an antitrust attack." International Ass'n of H. & F. I. & A. W. v. United Con. Ass'n, 331 F.Supp. 1298, 1300 (1971).
 
 
 15
 Having ruled that it had jurisdiction, the District Court turned to the determination whether the alleged activities are substantively immune from an antitrust attack. Again the District Court made an exhaustive canvass of the provisions of the antitrust laws[2] and cases[3] bearing on this issue and concluded:
 
 
 16
 "Notwithstanding the bald conclusion that competition in the construction industry of Western Pennsylvania is adversely affected by the instant collective bargaining agreement (competition in which the plaintiffs, in any event, have no justiciable interest), the plaintiffs in this case allege no facts which would even remotely taint the immunity provided the defendant Associated Trades from the antitrust laws. By Sec. 6 of the Clayton Act, the existence of Associated Trades is expressly insulated from the antitrust laws. As to the collective bargaining agreement, the competition which it is alleged to foreclose is not that in a market in which the non-labor group competes, but rather that of the competition between labor organizations for the right to represent certain employees. This competition is clearly not the concern of the antitrust laws. [Footnote omitted.] Further, the aid of which the plaintiffs complain in the instant action flows from the non-labor group to the labor organization which is the reverse of that condemned in Allen Bradley [325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1965)] and Pennington [381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965)]. We conclude, therefore, that the alleged activities are immune from the antitrust laws and this action must be dismissed. An appropriate Order will be entered."
 
 
 17
 It appears at the foot of the opinion as follows:
 
 
 18
 "ORDER.
 
 
 19
 And Now, to wit, this 6th day of August, 1971, It is Ordered, in consideration of the foregoing Opinion, that the defendants' Motions to Dismiss be and the same hereby are granted."
 
 
 20
 * In simply asserting that the Unions have alleged no fact which would taint the immunity of the labor group, the District Court did not deal with the allegation that the members of the Association were also members and officers of the Trades and Crafts Union, which could result in contravening the provisions of the antitrust law. Since the appeal arises from the granting of motions to dismiss, all well-pleaded facts must be taken as true.[4]
 
 
 21
 The question of whether or not a person is functioning in a given occupation as an employee or as an independent contractor has been treated in numerous cases. In United States v. Los Angeles Meat & Provision Drivers Union, 196 F.Supp. 12 (S.D. California, 1961) affirmed 371 U.S. 94, 83 S.Ct. 162, 9 L. Ed.2d 150 (1962), a test was evolved based on pronouncements by the Supreme Court in Bakery and Pastry Drivers and Helpers Local, etc. v. Wohl, 315 U.S. 769, 62 S.Ct. 816, 86 L.Ed. 1178 (1941), and in Milk Wagon Drivers' Union v. Lake Valley Farm Products, 311 U.S. 91, 61 S.Ct. 122, 85 L.Ed. 63 (1940), in which the Court sanctioned the joinder of independent contractors' groups with unions:
 
 
 22
 "(1) if these groups compete with union members by doing the same or similar work; and (2) if the object of having these groups join the union is to eliminate their unfair competition with union members, and the consequent lowering of the wages and working conditions of union members." 196 F.Supp. at 15.
 
 
 23
 The same court, commenting on a similar problem in United States v. Fish Smokers Trade Council, 183 F.Supp. 227 (S.D.N.Y. 1960) found that:
 
 
 24
 "However, the true significance of the Fish Smokers case is not that it merely states the circumstances under which independent contractors may not properly be forced into a union. Rather, the real importance of this decision lies in the fact that it indicates the result of such a misalliance, which is that the union and the independent contractors have put together a combination in restraint of trade, in violation of the Sherman Act." 196 F. Supp. at 16-17.
 
 
 25
 If those belonging to the union are independent contractors rather than a group of workers, then what seemed to be a closed shop labor agreement becomes a conspiracy to restrain competition. It falls back into being the type of conspiracy which it would be without its labor agreement mantle. In United States v. Los Angeles Meat & Provision Drivers Union, supra, thirty-five to forty-five out of some forty or fifty grease peddlers in Los Angeles had become a local affiliated with the International Brotherhood of Teamsters. Their work consisted of buying waste grease from restaurants and selling it to processors. The union agreement increased the margin of profit on the prices they would be paid for grease, allocated territories among them, and required processors to deal only with members of the union. In affirming, the Supreme Court held that a court of equity has power to order the dissolution of an association of business men who have become members of a union for the purpose of increasing the margin of profit on grease prices. In a case with similar facts, Columbia River Co. v. Hinton, 315 U.S. 143, 62 S. Ct. 520, 86 L.Ed. 750 (1942), involving fishermen who owned their own boats and sold fish to processors, the Court held that the Norris-LaGuardia Act "was not intended to have application to disputes over the sale of commodities." (315 U.S. at 145, 62 S.Ct. at 522).
 
 
 26
 Even though a small business man may be compensated for his labors in the form of a profit on the sale of commodities, the crucial distinction which can nevertheless make him an employee rather than a business man for purposes of the National Labor Relations Act is whether his job competes with others doing the same work, thus driving down their wages. Hence in Milk Wagon Drivers' Union, supra, the Court held that independent vendors of milk who bought milk from dairies and sold on consignment were in direct competition with employee-drivers and thus could properly belong to a union.
 
 
 27
 Another test which has been applied to distinguish independent contractors has been the degree of control exercised over them by their employers. In N.L.R. B. v. Hearst Publications, Inc., 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944) the Court found inter alia that "the designated newsboys . . . have their total wages influenced in large measure by the publishers, who dictate their buying and selling prices, fix their markets and control their supply of papers. Their hours of work and their efforts on the job are supervised and to some extent prescribed by the publishers or their agents." (322 U.S. at 131, 64 S.Ct. at 861.)
 
 
 28
 Although all these cases involve the selling of commodities, it is obvious that margin of profit on sales shades into wages readily, and that the sale of commodities shades into the sale of personal services. Therefore the courts have sought to fashion the labor exemption in the Sherman Act according to the foregoing analyses of the function of the work in its relevant economic relationships, rather than by applying a test of whether commodities or services are being sold. Thus in Taylor v. Local No. 7, International Union of Journeymen Horseshoers, 353 F.2d 593 (4th Cir. 1965), the court held that the defendant farriers were independent contractors, with the result that their agreement to charge $16 for shoeing a race horse constituted price fixing, which they enforced with boycotting. The foregoing case of Taylor v. Local No. 7, International Union of Journeymen Horseshoers, based its holding, among others, on American Medical Association v. United States, 317 U.S. 519, 63 S.Ct. 326, 87 L. Ed. 434 (1943), wherein the American Medical Association and the Medical Society of the District of Columbia were convicted of conspiring to violate the Sherman Act. The court held:
 
 
 29
 "A nonprofit corporation, Group Health, had been organized by government employees to provide medical and hospital care on a prepayment plan and employed full-time physicians on a salary basis. The accused, certain individuals some of whom were their own officers or employees, and some of their members who were practicing physicians, sought, among other things, to coerce other of accused's physician members from accepting employment under Group Health, to prevent accused's members from consulting with Group Health's doctors who might desire consultation, and to prevent hospitals in and about Washington from affording facilities for the care of patients of Group Health's physicians. The Court assumed that doctors who had contracts with Group Health were employees of that corporation. It was argued that there was a dispute concerning terms and conditions of the employment of doctors in which the accused were interested; that when a committee of the D.C. Medical Society first conferred with representatives of Group Health, a controversy arose, the matrix of which was the terms and conditions of employment by Group Health of members of the District Society to perform Group Health's medical work; that Group Health rejected an offered basis of employment of members of the District Society and insisted upon dictating the terms and conditions of such employment and method of payment of compensation. The Court held that the accused did not represent employees, either present or prospective; that their purpose was to prevent anyone from taking employment under Group Health; the accused 'were not an association of employees in any proper sense of the term. They were an association of individual practitioners each exercising his calling as an independent unit. [Emphasis supplied.] These independent physicians, and the two * * * associations which represent them, were interested solely in preventing the operation of a business conducted in corporate form by Group Health. In this aspect the case is very like Columbia River Packers Assns. v. Hinton, 315 U.S. 143 [62 S. Ct. 520, 86 L.Ed. 750].' (317 U.S. at 536, 63 S.Ct. at 332.) The Court concluded that no labor dispute was involved and the activities of the accused were not protected by the Clayton and Norris-LaGuardia Acts." (353 F.2d at 605.)
 
 
 30
 Also in a recent case, Goldfarb v. Virginia State Bar, 355 F.Supp 491, (D.C. E.D. Va. 1973), it was held that a minimum fee schedule is a form of price-fixing. This holding cited as authority United States v. Real Estate Boards, 339 U.S. 485, 70 S.Ct. 711, 94 L.Ed. 1007 (1950).
 
 
 31
 In the instant case, nothing which appears in the record controverts the independent-contractor status of the members of the Association who, it is alleged, also belong to the Trades and Crafts Union. The District Court did not determine that as a result this is not a controversy which arises from a labor dispute and apparently, in its view of the law, the status of the Association was not relevant. It considered merely whether anything which had been shown could taint the immunity of the Trades and Crafts Union.
 
 The complaint charges:
 
 32
 "8. In furtherance of this scheme and conspiracy, the defendants have executed sham collective bargaining agreements between them. The purpose of these sham collective bargaining agreements is to permit the member employers of the defendant Association to conduct their business activities free from any interference by the Plaintiff Unions, to use the agreements as a bar to any and all organizational efforts undertaken by the Plaintiff Unions, and to prevent their employees from becoming members of Plaintiff Unions, and to eliminate competition of business operating under the terms of bonafide collective bargaining agreements." (App. 10a).
 
 
 33
 In dealing with an appeal from a motion to dismiss under F.R.Civ.P. 12(b) (6), the court in Prepmore Apparel, Inc. v. Amalgamated Clothing Workers of America,[5] stated:
 
 
 34
 "The issues presented must be considered in the context of notice type pleading. * * *
 
 
 35
 "'* * * The complaint is to be liberally construed, and a dismissal is not warranted unless it is clear that plaintiff would be entitled to no relief under any state of facts that might be proved in support of the complaint.'
 
 
 36
 "* * * We can assume for the purpose of notice pleading that a business purpose undergirded the alleged conspiracy."
 
 
 37
 Rule 8(f) F.R.Civ.P. states: "Construction of Pleadings. All pleadings shall be so construed as to do substantial justice."
 
 
 38
 Applying the foregoing liberal standards to this complaint, then, we can assume that the allegation in the complaint of "sham collective bargaining agreements" had a purpose which would be to the disadvantage of the labor group, for example, low wages. Although the contractors, through their participation, would not be directly setting prices on commodities in the usual sense as the gravamen of the conspiracy, they could nevertheless be conspiring to set a price on labor which would affect prices and margin of profit.
 
 
 39
 As stated above, Pennington held that collective bargaining agreements may violate the Sherman Act "even though the mechanism for effectuating the purpose of the combination was an agreement on wages . . . or on hours of work."[6] Viewed in this way, the membership in the union by the contractors would not be for the purpose of raising the wages and working conditions of the union employees, but for the purpose of increasing the income of the entrepreneurs, flowing from their services as contractors. As stated in United States v. Real Estate Boards, "The fixing of prices and other unreasonable restraints have been consistently condemned in case of services as well as goods."[7]
 
 
 40
 Quite apart from the issue of the dual membership in both organizations by the contractors, there is the issue of the possibilities for abuse present in their formation of a multi-employer bargaining unit. Although such units have been allowed, "One group of employers may not conspire to eliminate competitors from the industry and the union is liable with the employers if it becomes a party to the conspiracy."[8] In Cordova v. Bache & Co.,[9] the court denied a motion to dismiss a claim by securities representatives who charged that their employers, some 42 stock exchange brokerage firms and the New York Stock Exchange, had conspired to lower the commission rates paid to them. In an exhaustive opinion, Judge Mansfield held that the exemption for human labor of section 6 of the Clayton Act was concerned with the right of labor to band together for mutual protection, and "not with the right of employers to band together for joint action in fixing the wages to be paid by each employer." Judge Mansfield went on to say that:
 
 
 41
 "There can be little doubt about the fact that if a group of employers, as the complaint here alleges, were allowed, not as part of a collective bargaining agreement, to agree together to reduce the commissions paid to their respective employees, they would have the same power to restrain competition as is inherent in a price-fixing agreement."[10]
 
 
 42
 Analyzing the conditions under which a multi-employer bargaining unit could keep within permissible bounds, Judge Mansfield stated:
 
 
 43
 ". . . the affected employees, through their collective bargaining representatives, must unequivocally consent to bargain with the multi-employer unit, NLRB v. Great Atlantic & Pacific Tea Co., 340 F.2d 690, 692-693 (2nd Cir. 1965). Although the point at which employers may act jointly has not been fixed with certainty, such action is permissible only in connection with, or at most in preparation for, collective bargaining negotiations or agreements with employees or unions exempt from the prohibitions of the anti-trust laws. See Volkswa-genwerk v. FMC, 390 U.S. 261, 88 S. Ct. 929, 19 L.Ed.2d 1090 (1968)."[11]
 
 
 44
 In the instant case it is alleged that the employers compel their employees to maintain membership in the Trades and Crafts Union.[12] If that is so, then there could be no "unequivocal[ly] consent to bargain with the multi-employer unit." Neither could the labor group retain its immunity under a state of the facts such as is alleged here, since by agreeing to accept lower wages than it would obtain through arm's-length, collective bargaining, it would not be pursuing legitimate aims of labor, but rather aiding the non-labor group in its purpose to restrain competition.[13] Allen Bradley Co.[14] stands for the proposition that even though the ultimate purpose of the union is to obtain employment opportunities for its members, it may not do so by helping the employers to control prices.
 
 
 45
 Appellant Unions and their members claim to be injured in that the conspiracy has had the following effects:
 
 
 46
 ". . . prevented plaintiffs from performing their statutory rights and duties as duly recognized and existing bargaining representatives of employees engaged in interstate commerce in the building and construction industry in the various counties of the Western District of Pennsylvania.
 
 
 47
 "Further, through this unlawful conspiracy, scheme and illegal combination, the members of Plaintiff Unions have been unlawfully denied the right to work and earn wages on the building and construction industry jobs obtained by the members of the defendant Association by reason of their unlawful competitive advantage thus obtained over employers operating under bona fide collective bargaining agreements with the plaintiff Unions."[15]
 
 It is provided in 15 U.S.C. Sec. 15 that:
 
 48
 "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor. . . ."
 
 Section 26 of 15 U.S.C. reads:
 
 49
 "Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws. . ."
 
 
 50
 In regard to the allegation that the members of the Unions have lost the right to work and earn wages, the District Court held that the Unions have no justiciable interest in competition in the construction industry of Western Pennsylvania. Addressing this determination, it is necessary to examine the question of whether the loss of employment is an injury to a person's "business or property." In Nichols v. Spencer International Press, Inc.,[16] the court held that a "no-switching" agreement between two publishers affected freedom of employment. Dealing with the problem of definition, the court said:
 
 
 51
 "Work as the employee of another is not, indeed, an independent business enterprise, and an opportunity to perform such work may not be property in the ordinary sense, but the interest invaded by a wrongful act resulting in loss of employment is so closely akin to the interest invaded by impairment of one's business as to be indistinguishable in this context."[17]
 
 
 52
 The Seventh Circuit relied upon Radovich v. National Football League[18] for the proposition that loss of opportunity to be employed could form the basis for damages under the antitrust laws. The court mentioned that in its earlier opinion in Roseland v. Phister Mfg. Co.[19] it had said that "business denotes the employment or occupation in which a person is engaged to procure a living" and that in the light of the remedial purpose of the section, Roseland should not be barred "'by what seems to us a strained and unjustified limitation' on the meaning of 'business."'[20] Further, the court drew the implication that "agreements among supposed competitors not to employ each other's employees not only restrict freedom to enter into employment relationships, but may also, depending upon the circumstances, impair full and free competition in the supply of a service or commodity to the public."[21] It was not necessary, in the court's view, for plaintiffs to prove that the defendant publishers were conspiring to obtain a dominant position, but merely that their inhibition on the freedom of their employees restrained the operation of competitive forces in general.
 
 
 53
 By the same token there is no reason to exclude the activities of a union from the scope of the word "business." A union is an association which is in the business of representing employees, and thereby it obtains property, hires officials, etc., and this is so regardless of whether or not it is incorporated.
 
 
 54
 Speaking of an agreement by a union to favor one set of employers at the expense of another, United States Mine Workers of America v. Pennington[22] stated:
 
 
 55
 "For the salient characteristic of such agreements is that the union surrenders its freedom of action with respect to its bargaining policy. . . . After the agreement the union's interest would be bound in each case to that of the favored employer group. It is just such restraints upon the freedom of economic units to act according to their own choice and discretion that run counter to antitrust policy." See also Simpson v. Union Oil Co., 377 U.S. 13, 16, 84 S.Ct. 1051, 12 L.Ed.2d 98 (1964); Anderson v. Shipowners Assn., 272 U.S. 359, 362, 47 S.Ct. 125, 71 L.Ed. 298 (1926).
 
 
 56
 Such a statement should suffice to show that in the Supreme Court's view a union is also an economic unit with an interest in freedom from illegal restraint, and if it does have such a protectible interest then that interest would be invaded by a restraint, and therefore it would suffer damage to its property or business.
 
 
 57
 The District Court stated in its opinion that "[a]s to the collective bargaining agreement, the competition which it is alleged to foreclose is not that in a market in which the non-labor group competes, but rather that of the competition between labor organizations for the right to represent certain employees. This competition is clearly not the concern of the antitrust laws. [Footnote omitted.]"[23] In the District Court's view there is no standing either for the Unions or their members. This result may be tested against the standard expressed in Radovich v. National Football League:[24]
 
 
 58
 "Petitioners' claim need only be 'tested under the Sherman Act's general prohibition on unreasonable restraints of trade,' Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 614, 73 S.Ct. 872, 97 L.Ed. 1277 (1953), and meet the requirement that petitioner has thereby suffered injury. Congress has, by legislative fiat, determined that such prohibited activities are injurious to the public [footnote omitted] and has provided sanctions allowing private enforcement of the antitrust laws by an aggrieved party. . . . In the face of such a policy this Court should not add requirements to burden the private litigant beyond what is specifically set forth by Congress in those laws."
 
 
 59
 The Third Circuit advanced this policy when it rejected the "passing-on" doctrine in Hanover Shoe, Inc. v. United Shoe Machinery Corporation,[25] wherein Judge Goodrich, in an action under the Clayton Act, applied traditional tort theory to antitrust claims involving overcharge to consumers, saying that the excessive price was the injury, and that the causal relation between the defendant's wrong and the plaintiff's harm was obvious; the defendant could not avoid liability on a theory that the plaintiff had passed along the overcharge to his customers:
 
 
 60
 "Thus, if a man is injured by the negligence of another and has the good fortune to have an insurance policy which recompenses him for loss, the insurance money does not reduce the damages which the wrongdoer must pay."[26]
 
 
 61
 Further, Judge Goodrich quotes the maxim that in regard to damages, at least, the general tendency of the law is not to go beyond the first step, but to hold the defendant liable if proximately the plaintiff has suffered a loss. See also Mandeville Island Farms, Inc. v. American Crystal Sugar Co.,[27] an action under the Sherman Antitrust Act, in which the Court stated:
 
 
 62
 "The statute does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers. Nor does it immunize the outlawed acts because they are done by any of these. Cf. United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129; American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575. The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated. Cf. United States v. South-Eastern Underwriters Assn., supra, at 553 of 332 U.S., at page 1173 of 64 S. Ct., 88 L.Ed. 1440."
 
 
 63
 In attempting to delimit the scope of the duty of care under a theory of proximate cause, courts have evolved a doctrine which holds that the defendant is liable for harm to persons who are within the "target area." One of the leading cases to enunciate this doctrine is Karseal Corp. v. Richfield Oil Corporations.[28] Karseal makes use of a passage in Conference of Studio Unions v. Loew's Inc.,[29] that plaintiff must show that he is "within that area of the economy which is endangered by a break-down of competitive conditions in a particular industry. Otherwise he is not injured 'by reason' of anything forbidden in the anti-trust laws."
 
 
 64
 In Karseal the plaintiff was a manufacturer of automobile waxes which, it was alleged, had been excluded from independent service stations through exclusive dealing arrangements by which Richfield controlled the choice of petroleum products and automobile accessories to be offered for sale. The court poses the question whether Karseal's product is within that area of the economy which is endangered by a breakdown of competition, and continues as follows:
 
 
 65
 "Or in other words, was Karseal within the 'target area' of Richfield's illegal practices, determined in the Richfield case? Assuming Karseal was 'hit' by the effect of the Richfield antitrust violations, was Karseal 'aimed at' with enough precision to entitle it to maintain a treble damage suit under the Clayton Act?"[30]
 
 
 66
 The court rejected defendant's argument that the restraint of trade had been impressed on the individual service station dealers, and thus the distributors of appellant, if there were any, would be one step removed, and appellant himself, the manufacturer, would be even more removed. The court commented:
 
 
 67
 ". . . what was Richfield's violation? It applied the illegal restraint at the level of the independent service stations. The restraint was directed against the particular products, in their finished form (including Karseal's wax), . . . .
 
 
 68
 "Primarily the operation and effect of the illegal practices was on the products . . . which were competitive to the Richfield sponsored products. The impact was on the market. The gist of the violation was the prevention or impeding of the sale of these competitive products. . . . Such persons and such products were the 'target' of the illegal practices.
 
 
 69
 ***
 
 
 70
 * * *
 
 
 71
 "* * * We need not pass on whether such distributors have a cause of action. But it would appear that both the manufacturer and the independent distributor have such a cause of action."[31]
 
 
 72
 In the instant case, the Unions allege that the restraint which was applied at the level of the Association's own employees had a purpose to exclude them from competition. Although it may be true that competition amongst labor unions is not ordinarily the concern of the antitrust laws, such a sweeping statement would fail to anticipate every situation. Within a labor dispute a competition between unions is the concern of the Board, but where a case is made out that there is no labor dispute, or that the labor group is not immune, there is no reason to hold that a union is any different from any other economic unit in its right to be protected from illegal restraints on its freedom to compete.
 
 
 73
 Where the restraint is alleged to operate through coercion on defendants' own employees, a competing union is a plaintiff well-suited to raise the public issue, as were the competing manufacturers in Karseal. It has the resources and the motivation to do so, whereas the coerced participants in the conspiracy are likely to have neither in sufficient amount.
 
 
 74
 Returning to the claim of the members of the Unions for loss of employment, the complaint states:
 
 
 75
 "Further, through this unlawful conspiracy, scheme and illegal combination, the members of Plaintiff Unions have been unlawfully denied the right to work and earn wages on the building and construction industry jobs obtained by the members of the defendant Association by reason of their unlawful competitive advantage thus obtained over employers operating under bona fide collective bargaining agreements with the plaintiff Unions."[32]
 
 
 76
 According to traditional theories of direct-indirect harm which have been applied by court decisions in order to limit the sweep of antitrust liability, the harm suffered by members of the Unions would be indirect, as they are adversely affected by the conspiracy directed against their employers, the non-Association contractors, not parties to the present suit. However, the "target" theory logically can encompass any claim of damage in the affected area.
 
 
 77
 The case which first enunciated this principle, Conference of Studio Unions v. Loew's Inc.,[33] anticipated standing in the instant case by negative implication when it detailed its own facts. In Conference the plaintiff unions' members (also plaintiffs), were employees of the defendant Major studios, who had been laid off as a result of an alleged conspiracy between the Majors and a competing union. The alleged conspiracy was directed against those known as the Independent studios, producers of a small number of inexpensive films, who were competitors of the Majors. In holding that the damage to the plaintiff union was merely incidental to the accomplishment of the illegal object, the court held:
 
 
 78
 "The entire import of the alleged conspiracy, insofar as competitive conditions are concerned, is the attempt to destroy the Independents. Any restraint on commercial competition would occur in the production of motion pictures and we fail to see how the appellants are in a position to complain about that situation. They are not in the business of producing motion pictures; they do not exhibit motion pictures; they neither compete with the Majors nor purchase from them. In fact, they are not employees of the companies whom it is alleged the appellees intend to destroy. The damage alleged to have been suffered by appellants does not flow from any injury to the competitive situation of the motion picture industry, that is, their injury has not arisen from the acts allegedly perpetrated against the Independents."[34] (Emphasis added.)
 
 
 79
 In the instant case, the members of the Unions allege that they are employees of the contractors against whom the conspiracy is aimed. As such, their position would not be similar to that of a stockholder in a corporation because recovery by construction employees would not necessarily involve duplication. Allocation of losses by the employers and employees is possible; in the ordinary construction situation, the contractor receives a percentage of the total cost as his own profit margin, and the employees receive wages according to the time they work, which contributes to the basic cost. The contractor's profit margin is a separate cost superimposed on that total. Under the broader definition of "business" which has evolved since Conference, it can also be argued that the plaintiff members of the Unions are competing for employment directly against the defendant members of the Trades and Crafts Union. At least in a situation such as this one, where under the statute the plaintiff can make out a claim to be within the class of persons entitled to protection and suffering the type of injury the statute was intended to guard against, it should not be dismissed for lack of standing.[35]
 
 
 80
 Appellees' reliance on the Conference case for authority that the Unions in the instant case do not have a cause of action is misplaced. In Conference the unions and their members complained of their loss of employment with the defendant Major studios. In the instant case the Unions complain of the loss of their right to be the bargaining agents of members of the Trades and Crafts Union. Since their income is derived from the dues of their members, it would be contrary to common sense to say that a right to acquire members is not a property right of a labor union.
 
 
 81
 There is no merit to the point raised by appellee Trades and Crafts Union that "no facts exist to demonstrate that a labor union with a membership of approximately one hundred and forty can exert an anti-competitive effect upon twenty-eight labor organizations whose membership each individually numbers in the many thousands."[36] The thousands of members of the appellant Unions are not all actors taking part in the present controversy in Pittsburgh. The participants directly involved on both sides may be few in number. Nor is it necessary to prove that competition is entirely eliminated.[37]
 
 
 82
 The foregoing discussion persuades us that contrary to the conclusion of the District Court, the Association and the Trades and Crafts Union are not immune from the antitrust laws and that the Unions and their members are entitled to standing in this action. Notwithstanding, we make no judgment as to whether the defendants' actions were the cause of the plaintiffs' damage, but only that the complaint raises a triable antitrust issue.[38]II
 
 
 83
 In the foregoing discussion in section I, we have found that the Unions and their members have stated a cause of action and have standing under their complaint based on the antitrust laws. Also there were before the District Court the motions of the Association and the Trades and Crafts Union to dismiss the complaint based on the ground, among other things, that the complaint rested on alleged violations of the National Labor Relations Act, which were said to be within the exclusive jurisdiction of the National Labor Relations Board.
 
 
 84
 Now we are met with the question whether it is permissible for the District Court to resolve, at least in the first instance, all the issues raised on the face of the complaint or whether this is a proper case for the application of the doctrine of primary jurisdiction for the District Court first to defer to the National Labor Relations Board (hereinafter the Board) for a resolution of certain of the labor issues here posed.
 
 
 85
 Our inquiry into the soundness of the District Court's determination that it is vested with jurisdiction in this case well may begin with the succinct statement of the problem contained in Allen Bradley Co. v. Union, 325 U.S. 797, 806, 65 S.Ct. 1533, 1538, 89 L.Ed. 1939 (1944):
 
 
 86
 "The result of all this is that we have two declared congressional policies which it is our responsibility to try to reconcile. The one seeks to preserve a competitive business economy; the other to preserve the rights of labor to organize to better its conditions through the agency of collective bargaining. We must determine here how far Congress intended activities under one of these policies to neutralize the results envisioned by the other."
 
 
 87
 The test for reconciling them was expressed earlier in United States v. Hutcheson, 312 U.S. 219, 232, 61 S.Ct. 463, 466, 85 L.Ed. 788 (1940), as follows:
 
 
 88
 "So long as a union acts in its self-interest and does not combine with non-labor groups, [footnote omitted] the licit and the illicit . . . are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means."
 
 
 89
 Reflecting on this quotation in Mine Workers v. Pennington, 381 U.S. 657, 662, 85 S.Ct. 1585, 1589, 14 L.Ed.2d 626 (1965), the Court amplified it as follows:
 
 
 90
 "And in Allen Bradley Co. v. Union, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939, this Court made explicit what had been merely a qualifying expression in Hutcheson and held that 'when the unions participated with a combination of business men who had complete power to eliminate all competition among themselves and to prevent all competition from others, a situation was created not included within the exemptions of the Clayton and Norris-LaGuardia Acts.' Id. 325 U.S. at 809, 65 S.Ct. at 1540 [Citations omitted.] Subsequent cases have applied the Allen Bradley doctrine to such combinations without regard to whether they found expression in a collective bargaining agreement, Brotherhood of Carpenters v. United States, supra, 330 U.S. 395, 67 S.Ct. 775, 91 L.Ed. 973; see Teamsters Union v. Oliver, 358 U.S. 283, 296, 79 S.Ct. 297, 3 L.Ed. 2d 312 and even though the mechanism for effectuating the purpose of the combination was an agreement on wages, see Adams Dairy Co. v. St. Louis Dairy Co., 260 F.2d 46 (C.A. 8th Cir. 1958), or on hours of work, Philadelphia Record Co. v. Manufacturing Photo-Engravers Ass'n., 155 F.2d 799 (C.A.3d Cir. 1946)."
 
 
 91
 In Pennington, supra, the Court went on to say that although wages lie close to the heart of the subject about which unions and employers must bargain, ". . . there are limits to what a union or an employer may offer or extract in the name of wages, and because they must bargain does not mean that the agreement reached may disregard other laws."[39] The court held that although a union could seek to implement a national wage scale and to impose a uniform scale on a multi-employer unit as long as it did so in pursuit of its own interests, leaving itself the freedom to bargain with particular units as its own interests required, the union would forfeit its antitrust exemption if it could be clearly shown that it had agreed with one set of employers to impose such a scale on other employers for the purpose of eliminating competitors. Therefore an allegation that an agreement has exceeded the limits of labor's immunity and comes within the reach of the antitrust laws brings a complaint within the court's jurisdiction.[40]
 
 
 92
 *****
 
 
 93
 * * *
 
 
 94
 In Meat Cutters v. Jewel Tea, 381 U. S. 676, 684-685, 85 S.Ct. 1596, 14 L.Ed. 2d 640 (1965), Justice White set forth the doctrine of primary jurisdiction of the National Labor Relations Board.
 
 
 95
 "The doctrine of primary jurisdiction . . . applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.' United States v. Western Pac. R. Co., 352 U. S. 59, 63-64, 77 S.Ct. 161, 1 L.Ed.2d 126. The doctrine is based on the principle 'that in cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion, agencies created by Congress for regulating the subject matter should not be passed over,' Far East Conference v. United States, 342 U.S. 570, 574, 72 S.Ct. 492, 96 L.Ed. 576 and 'requires judicial abstention in cases where protection of the integrity of a regulatory scheme dictates preliminary resort to the agency which administers the scheme,' United States v. Philadelphia Nat. Bank, 374 U.S. 321, 353, 83 S.Ct. 1715, 10 L.Ed.2d 915."
 
 
 96
 Thus, where the doctrine is invoked, the court is not ousted of its subject matter jurisdiction. Rather, where a particular issue is important to the overall determination of the suit, and where resolution of that problem in the first instance has been vested in a particular agency, the court must certify the question of law to the relevant agency (the Board, here). In the interim, the court merely stays the proceedings before it while the matter referred to the agency is resolved. The agency then returns its findings of fact and conclusions of law on the question(s) certified. Thereafter, the court in deciding the case should give appropriate weight to the Board's determinations.
 
 
 97
 A corollary thesis under the doctrine of primary jurisdiction is that the relevant agency's statute of limitation is not applicable in such a judicial certification. See United States v. Western Pac. R. Co., 352 U.S. 59, 70-74, 77 S.Ct. 161, 1 L.Ed.2d 126. This results from the fact that the independent jurisdiction of the agency is not invoked. Rather, jurisdiction in a referral is derivative from that of the court in which the action is pending. The agency has no power to enter a binding order against the parties because it never acquires independent statutory jurisdiction over the parties. Consequently, the application of the doctrine is not foreclosed here, even though the Unions did not file this action until the Board's limitation period (29 U.S.C. Sec. 160(b)) had possibly expired.
 
 
 98
 Justice White's opinion concluded that the doctrine of primary jurisdiction did not automatically require a district court to refer a case to the Board merely because a complaint contained some issue which could possibly be resolved by the Board. However, although he held the doctrine was inapplicable in Jewel Tea, he did not hold that the doctrine is inapplicable in every case where antitrust issues intertwine with labor issues. In fact, Justice White's opinion expressly acknowledged the continuing validity of the doctrine of Western Pacific and that there would be "proper" cases for the application of the doctrine in which primary jurisdiction would lie with the Board. 381 U.S. at 684-686, 88 S.Ct. at
 
 
 99
 The Unions have alleged four specific ways in which the Association and the Trades and Crafts Union have effected this alleged conspiracy and combination:
 
 
 100
 (1) The Association was organized with the color of authority to act as bargaining representative for its members.
 
 
 101
 (2) This Association organized and/or supported the Trades and Crafts Union, which purports to be a labor organization for employees employed in the construction industry.
 
 
 102
 (3) The Association and the Trades and Crafts Union executed sham collective bargaining agreements between them, the purposes of which agreements were:
 
 
 103
 (a) to permit the member employers of the Association to conduct their business activities free from any interference by the Unions;
 
 
 104
 (b) to use the agreements as a bar to any and all organizational efforts undertaken by the Unions;
 
 
 105
 (c) to prevent their employees from becoming members of the Unions; and
 
 
 106
 (d) to eliminate competition of business operating under the terms of bona fide collective bargaining agreements.
 
 
 107
 (4) Membership in the Association automatically entitles an employer to membership in the Trades and Crafts Union and members of the Association are officers in the Trades and Crafts Union.
 
 
 108
 If allegation (4) were the only labor-related aspect of the instant case, the situation presented would be similar to that posed in Meat Cutters Local 189 v. Jewel Tea, 381 U.S. 676, 88 S.Ct. 1562, 20 L.Ed.2d 460 (1965). Invoking the doctrine of primary jurisdiction on the issue of whether this allegation alone constituted an unfair labor practice under the Labor Management Relations Act (hereinafter "the Labor Act") would serve no useful function. Thus, although the automatic membership provision might well constitute a violation of the Labor Act, as might have the insistence upon an operating hours provision by the defendant unions in Jewel Tea, resolution of the question of whether in fact allegation (4) violates the Labor Act is not a prerequisite to the determination of the antitrust issue. See Los Angeles Meat & Prov. Drivers Union v. United States, 371 U.S. 94, 83 S. Ct. 162, 9 L.Ed.2d 150 (1962).
 
 
 109
 However, this is not equally true of the other allegations of the complaint. These other allegations focus upon activities intimately related to the collective bargaining process. These alleged acts constitute violations of the Labor Act and if proven they would not involve activities which are protected under the Labor Act.
 
 
 110
 Since many of the acts which allegedly constitute an antitrust violation are also potentially unfair labor practice conduct or involve protected activities, a Board determination on the labor issues with related findings of fact as to each act is of substantial importance. For instance, if the allegations are true, then such acts would not be immune. On the other hand, if the Trades and Crafts Union was a valid union, entered into arm's length bargaining with the Association, and after such bargaining decided to accept a lower wage, no liability would attach. Thus, if the Board determines, and the court agrees, that there was no Labor Act violation, then the acts which constitute an important part of this suit would be within the antitrust immunity as protected activities. Additionally, a Board determination on the labor issues is crucial because some of the alleged anticompetitive effects of the Trades and Crafts Union's existence and its agreements with the Association are anticompetitive effects which result from every proper union-employer relationship.
 
 
 111
 If the District Court were to decide this case without Board involvement, it is clear from the complaint that it would in effect be first determining whether the alleged acts constituted unfair labor practices or involved protected activities. Allowing the District Court to make the threshold determinations on its own would undercut the statutory scheme which vests the right to make such determinations in the Board.
 
 
 112
 It is true that the antitrust issues are an important part of this case. But these issues intertwine with major labor issues, and a Board determination on those issues would be a "material aid" in adjudicating the antitrust cause of action. See Ricci v. Chicago Mercantile Exchange, 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973). Further, it must be remembered that primary jurisdiction is only a doctrine of initial determination. The antitrust issues would remain with and would be ultimately decided by the District Court; the Board would only decide the labor issues.
 
 
 113
 We reach our conclusion that this is a proper case for the application of the doctrine, in part, because the three factors which Justice White believed dictated the inapplicability of the doctrine in Jewel Tea are inapt here.
 
 
 114
 (1) Justice White found it unnecessary to defer to the Board's expertise because the subject matter of the determination which would have been referred to the Board in Jewel Tea was within the experience of the federal courts.
 
 
 115
 "To begin with, courts are themselves not without experience in classifying bargaining subjects as terms or conditions of employment. Just such a determination must be frequently made when a court's jurisdiction to issue an injunction affecting a labor dispute is challenged under the Norris-LaGuardia Act, which defines 'labor dispute' as including 'any controversy concerning terms or conditions of employment,' . . . ." 381 U.S. at 686, 85 S.Ct. at 1600.
 
 
 116
 The subject matter involved in the instant case-whether the defendant union was formed, dominated, and supported by the Association-is and has been one of the primary problems on which the Board has concentrated since the adoption of the Wagner Act in 1935. Unlike the labor issue in Jewel Tea, the initial fact-finding for the resolution of the labor issues presented here is not generally made by a court.
 
 
 117
 (2) Justice White decided, at the time the District Court in Jewel Tea was required to make its decision whether to refer the parties to the Board, the mandatory bargaining subject determination which could have been referred to the Board was "wholly unrelated" to the antitrust issue (alleged combination of unions with nonunion groups)[41] and was "of subsidiary importance at best." 381 U.S. at 686-687, 85 S.Ct. 1596. In the instant case, it is evident that the acts which constitute the basis of the antitrust issues also form a substantial part of the basis of the labor issues. Further, at the time the District Court made its decision not to refer the labor issues to the Board, the antitrust issues were closely related to the labor determinations.
 
 
 118
 (3) Justice White held Jewel Tea was not a proper case for the application of the doctrine of primary jurisdiction "because of the absence of an available procedure for obtaining a Board determination" in Jewel Tea's factual context. 381 U.S. 687-688, 85 S.Ct. at 1600.
 
 
 119
 (a) In Jewel Tea the procedure for obtaining a Board determination on the issue of whether the operating-hours provision was a mandatory bargaining subject was through the filing of a refusal to bargain charge with the Board. However, since the parties to the bargaining relationship had agreed to this provision, there was no basis for such a charge. Thus, the usual procedure of filing a charge in order to obtain a Board determination was unavailable in Jewel Tea.
 
 
 120
 Unlike Jewel Tea, an available procedure existed here for obtaining Board determination of whether the alleged acts constituted an employer-dominated union situation or involved protected activities. While the collective bargaining agreement barred the possible unfair labor practice route in Jewel Tea, the actual agreement here forms the basis of an unfair labor practice charge. Since any person can file a charge, strangers to the bargaining relationship, such as the Unions here, had an available procedure for obtaining a Board determination.
 
 
 121
 Also, the referral to the Board of the issues here which state potential violations of the Labor Act will place the labor issues before the Board in a context almost identical to the situation where a party files an unfair labor practice charge with the General Counsel of the Board. Thus, the Board can resolve the referred labor issues without variance from its normal procedure for deciding whether a particular factual situation constitutes an unfair labor practice or involves protected activities.
 
 
 122
 (b) Even in a case where the antitrust allegations could be framed as an unfair labor practice charge, Justice White stated in Jewel Tea that he believed there would still be an "absence of an available procedure for obtaining a Board determination" for two reasons. First, since the Board's General Counsel, as part of his function of screening frivolous charges, can refuse to issue a complaint, "there is no guarantee of Board action." Secondly, "the six-month limitation period of Sec. 10(b) of the Act, 29 U.S.C. Sec. 160(b) [1971], would preclude many litigants from even filing with the General Counsel." 381 U.S. at 687-688, 85 S.Ct. at 1601. This potential preclusion is especially relevant in an antitrust matter for it may be several years before the antitrust violation is discovered.
 
 
 123
 The two reasons given by Justice White, standing alone, would bar the application of the doctrine of primary jurisdiction whenever the National Labor Relations Board was the concerned administrative agency. This must be reconciled with Justice White's indication in his first two factors that there would be "proper" cases for the application of the doctrine-e. g., where the district courts are "without experience" in the particular subject matter of labor-management relations, or where the Board's determination would be "related" to the controlling legal issue. Both factors are present here.
 
 
 124
 As to the first reason-no guarantee of Board action-we believe it gives too narrow an interpretation to the doctrine of primary jurisdiction. Under the doctrine, the District Court would certify the labor issues to the Board for findings of fact concerning each alleged act and conclusions of law. The Board is expected to honor this certification, and of course, the Board is free to request the assistance of its General Counsel. In the context of applying the doctrine, we do not read the statute as requiring action to be initiated by General Counsel.
 
 
 125
 The second reason-the Labor Law statute of limitation-is also not a bar to the application of the doctrine. As stated earlier, Western Pacific held the relevant agency's statute of limitation is not applicable in a judicial referral under the doctrine of primary jurisdiction. 352 U.S. at 70-74, 77 S.Ct. 161, 1 L.Ed. 2d 126. The referral, even after the passage of the six-month period, prevents the labor regulatory scheme from being subverted. And, since under the doctrine only the Board's determination would be available, not its remedy, a party would not be able to circumvent the time limitation by invoking the doctrine in the district court.
 
 
 126
 In support of this second reason, Justice White's opinion quoted from Montana-Dakota Utilities Co. v. Northwestern Public Service Co., 341 U.S. 246, 254, 71 S.Ct. 692, 95 L.Ed. 912 (1951):
 
 
 127
 "[W]e know of no case where the court has ordered reference of an issue which the administrative body would not itself have jurisdiction to determine in a proceeding for that purpose." 381 U.S. at 687-688, 85 S. Ct. at 1601, 14 L.Ed.2d 640.
 
 
 128
 In Montana-Dakota Utilities, the basis for the lack of jurisdiction of the administrative body (Federal Power Commission) was that the FPC did not have "subject matter" jurisdiction over the issue (reparations) which would have been referred to FPC-". . . Congress withheld from the Commission power to grant reparations . . ." 341 U.S. at 254, 71 S.Ct. at 696. Therefore, the Court's refusal to apply the doctrine of primary jurisdiction in that case did not subvert a regulatory scheme; nor did it keep from an administrative body an issue within its special expertise. Additionally, Western Pacific was decided after Montana-Dakota Utilities, and if the latter case is inconsistent with Western Pacific, it was presumably overruled.
 
 
 129
 Therefore, we believe that the doctrine of primary jurisdiction must be applied here. On remand, the District Court should certify all labor issues; all alleged acts should be referred for ease of administration. The Board should return to the District Court findings of fact as to the referred acts and conclusions of law as to the labor issues. Pending such determination, the District Court should stay all further proceedings in this cause of action. After the Board returns its determinations, the District Court can proceed to decide the antitrust issues. Thus, the application of the doctrine of primary jurisdiction would preserve the integrity of the federal labor regulatory scheme without denying the Unions a judicial determination of their antitrust cause of action.
 
 
 130
 The order of the District Court will be vacated, and the cause remanded for further proceedings consistent with this opinion.
 
 
 
 [1]
 Among others the District Court analyzed: Amalgamated Motor Coach Employees of America v. Lockridge, 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971); Amalgamated Meat Cutters of North America v. Jewel Tea Co., 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965); San Diego Building Trades Council v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959); Allen Bradley Co. v. Local Union No. 3, 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945); Prepmore Apparel, Inc. v. Amalgamated Clothing Workers, 431 F.2d 1004 (C.A.5, 1970); Tuscarora Plastics Company, 167 NLRB 1059 (1967)
 
 
 [2]
 Section 6 of the Clayton Act, 15 U.S.C. Sec. 17; Section 20 of the Clayton Act, 29 U.S.C. Sec. 52; and Section 2 of the Norris-LaGuardia Act, 29 U.S.C. Sec. 102
 
 
 [3]
 Among others the District Court examined:
 American Federation of Musicians v. Carroll, 391 U.S. 99, 88 S.Ct. 1562, 20 L.Ed.2d 460 (1968); Amalgamated Meat Cutters v. Jewel Tea Co., 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965); UMW v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); Allen Bradley Co. v. Local 3, I.B.E.W., 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1965); United States v. Hutcheson, 312 U.S. 219, 61 S.Ct. 463, 85 L.Ed. 788 (1941); Apex Hosiery v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940).
 
 
 [4]
 Gardner v. Toilet Goods Assn., 387 U.S. 167, 172, 87 S.Ct. 1526, 18 L.Ed.2d 704 (1967); Walker Inc. v. Food Machinery, 382 U.S. 172, 178, 86 S.Ct. 347, 15 L.Ed. 2d 247 (1965); Mandeville Farms v. Sugar Co., 334 U.S. 219, 222, 68 S.Ct. 996, 92 L.Ed. 1328 (1948); Noerr Motor Freight v. Eastern R.R. Presidents Con., 113 F.Supp. 737, 742 (E.D.Pa., 1953)
 
 
 [5]
 431 F.2d 1004, 1006 (5th Cir. 1970)
 
 
 [6]
 381 U.S. at 663, 85 S.Ct. at 1589, 14 L.Ed.2d 626
 
 
 [7]
 339 U.S. at 491, 70 S.Ct. at 715
 
 
 [8]
 381 U.S. 665, 666, 85 S.Ct. at 1591
 
 
 [9]
 321 F.Supp. 600, 606 (S.D.N.Y. 1970)
 
 
 [10]
 Id
 
 
 [11]
 Id. at 607
 
 
 [12]
 Complaint p 10, App. 11a
 
 
 [13]
 We deal with the mechanics of the resolution of these issues in part II infra
 
 
 [14]
 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1965)
 
 
 [15]
 App. 10a, 11a
 
 
 [16]
 371 F.2d 332 (7th Cir. 1967)
 
 
 [17]
 Id. at 334
 
 
 [18]
 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957)
 
 
 [19]
 125 F.2d 417 (7th Cir. 1942)
 
 
 [20]
 International Press, Inc., 371 F.2d at 335
 
 
 [21]
 Id. at 336
 
 
 [22]
 381 U.S. 657, 668, 85 S.Ct. 1585, 1592, 14 L.Ed.2d 626 (1965)
 
 
 [23]
 App. 19a, 20a
 
 
 [24]
 352 U.S. 445, 453, 77 S.Ct. 390, 395, 1 L.Ed.2d 456 (1957)
 
 
 [25]
 185 F.Supp. 826 (1960), affirmed 281 F.2d 481 (3 Cir. 1960)
 
 
 [26]
 185 F.Supp. at 829
 
 
 [27]
 334 U.S. 219, 236, 68 S.Ct. 996, 1006, 92 L.Ed. 1328 (1948)
 
 
 [28]
 221 F.2d 358 (9th Cir. 1955)
 
 
 [29]
 193 F.2d 51, 55 (9th Cir. 1951), cert. den., 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1952)
 
 
 [30]
 221 F.2d at 362
 
 
 [31]
 Id. at 364
 
 
 [32]
 App. 11a
 
 
 [33]
 193 F.2d 51 (9th Cir. 1951); cert. den., 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1952)
 
 
 [34]
 193 F.2d at 54
 
 
 [35]
 As stated in South Carolina Council of Milk Producers, Inc. v. Newton, 360 F.2d 414, 420 (4th Cir. 1966):
 "This is a critical determination which must be made by the court on the evidence offered by the plaintiff. At this point the court is in a position to foreclose claims by those only distantly or tenuously hurt. Thus the apprehension of 'wind-fall' recoveries is dispelled. In this process the court would rule upon the substantiality of the claim as it would in other damage actions."
 The opinion cites with approval the test of standing in Note, 64 Colum.L.Rev. 570, 587 (1964).
 
 
 [36]
 Brief for Appellee, Trades and Crafts Union, p. 7
 
 
 [37]
 See Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959)
 
 
 [38]
 As stated in South Carolina Council of Milk Producers, Inc. v. Newton, n. 35:
 "In disapproving the dismissal of the present suit, we are not finding that the actions of the defendants were in truth the cause of the plaintiffs' damage. Our judgment is only that the complaint when measured against the defendants' moving papers for summary judgment, presents a triable antitrust issue. Dismissal of a Sherman Act claim on motion, we are admonished, should be 'sparingly practiced.' . . . '[T]o state a claim upon which relief can be granted under that section [Sec. 1, Sherman Act], allegations adequate to show a violation and * * * that plaintiff was damaged thereby are all the law requires.' . . . Disposition on motion is not warranted 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' . . ." (Citations omitted.)
 
 
 [39]
 381 U.S. at p. 665, 85 S.Ct. at 1591
 
 
 [40]
 So much of the statutes pertaining to antitrust and to acts providing immunity therefrom as are pertinent to this case are as follows: Sherman Act, Secs. 1 and 2, 15 U.S.C. Secs. 1 and 2; Clayton Act, Sec. 4, 15 U.S.C. Sec. 15
 Immunity is conferred by the Norris-LaGuardia Act Sec. 4, 29 U.S.C. Sec. 104:
 "Sec. 104. Enumeration of specific acts not subject to restraining orders or injunctions
 "No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute . . from doing, whether singly or in concert, any of the following acts:
 "(b) Becoming or remaining a member of any labor organization or of any employer organization, . . ."
 Also under the Clayton Act, Sec. 6, 15 U.S.C. Sec. 17:
 "17. Antitrust laws not applicable to labor organizations.
 "The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor . . . organizations, instituted for the purposes of mutual help . . . or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws."
 
 
 [41]
 After the trial, "[t]he trial court found no evidence to sustain Jewel's conspiracy claim and this finding was not disturbed by the Court of Appeals." 381 U.S. at 688, 85 S.Ct. at 1601