TUGBOAT, INCORPORATED,
Plaintiff-Appellee,

v.

MOBILE TOWING COMPANY et
al., Defendants,

Seafarers International Union of North
America et al., Defendants-Appellants.

Algeen SARANTHUS et al., on behalf of
themselves and all other persons similar-
ly situated, Plaintiffs-Appellants,

v.

TUGBOAT, INCORPORATED et al.,
Defendants-Appellees.

`Nos. 75–3194, 75–3344.

United States Court of Appeals,
Fifth Circuit.

July 12, 1976.
Rehearing and Rehearing En Banc
Denied Sept. 28, 1976.

David Jaffe, New York City, Howard Schulman, New York City, Otto E. Simon, Mobile, Ala., for Seafarers, et al.

Lionel L. Layden, Mobile, Ala., Richard H. Markowitz, New York City, for National Marine Engineers.

J. Cecil Gardner, Mobile, Ala., Marvin Schwartz and Seymour Waldman, New York City, for Intern. Organization of Masters et al.

Alex F. Lanford, III, W. Ramsey McKinney, Jr., Mobile, Ala., for Tugboat Inc., et al.

Sam W. Pipes, III, Cooper C. Thurber, Mobile, Ala., for Ryan-Walsh Stevedoring.

Before AINSWORTH, MORGAN and RONEY, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

These two cases come before us as an outgrowth of the closely related struggles between Tugboat, Inc., and Mobile Towing Co. for domination of the tugboat services market in Mobile Bay and between Seafarers International Union of North America, Inland Boatmen's Union, National Marine Engineers' Beneficial Association, and District No. 1 Marine Engineers' Beneficial Association (collectively Seafarers) on the one hand and International Organization of Masters, Mates, and Pilots (Masters, Mates, and Pilots) on the other for the right to represent the workers in the local tugboat industry. No. 75–3194 involves antitrust counter-claims filed by the Seafarers; No. 75–3344 involves a class action by members of the Seafarers Union charging antitrust violations by Tugboat, Inc.

The essence of the claims in both of these actions is that Tugboat, Inc., conspired with members of Masters, Mates, and Pilots, a union whose local the owners of Tugboat, Inc., allegedly dominate, to restrain trade in the local towing industry by unfairly obtaining labor costs far cheaper than those available to Mobile Towing Co. The district court dismissed both actions, ruling that neither the Seafarers nor their members had standing to prosecute these antitrust claims whether for treble damages or for injunctive relief. Since these cases are before this court in the context of motions to dismiss, we must assume for purposes of this decision that the facts are as alleged by the plaintiffs. Accordingly, we assume that the owners of Tugboat, Inc. established and dominated the local bargaining unit of Masters, Mates, and Pilots and have utilized their domination of that union in an attempt to monopolize the local tugboat industry. As alleged, the conspiracy between Tugboat and Masters, Mates, and Pilots allowed Tugboat to prevent Seafarers from organizing Tugboat's employees thus allowing Tugboat to avoid the higher wages and larger crews called for in Seafarer's agreement with Mobile Towing. By reducing costs, Tugboat would be able to run Mobile

Towing out of business and monopolize the market. The question for this court is whether the unions or their members may argue that these practices violate the antitrust laws and entitled them to relief. Whether the defendants may invoke the preemption doctrine because the labor laws constitute a comprehensive regulatory scheme and thus remove this type of problem from protection under the antitrust laws is not properly before us at this time and, accordingly, we decline to reach that question.

## I.

The issue of standing to bring an antitrust action has received a great deal of judicial attention.[1] The statutory language upon which the courts have attempted to construct a doctrine of standing limiting who can complain of antitrust violations offers no clear guidance for determining who may sue. Despite extensive litigation of the standing issue in lower courts and a general predilection to review antitrust decisions, the Supreme Court has offered surprisingly little guidance on the standing question.

The statutory basis for a standing requirement in treble damage suits is Clayton Act § 4, 15 U.S.C. § 15.

*Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.* (Emphasis added.)

The lower courts have consistently read the "injured in his business or property" language of this statute to establish a standing requirement more demanding than that required in other types of actions.[2]

The comparable language governing standing in cases for injunctive relief is Clayton Act § 16, 15 U.S.C. § 26.

Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws . . . when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings . . .

It is apparent from the language of § 16 that the applicable standing rules in suits to enjoin antitrust violations are the general rules of standing.[3] The plaintiff need show only that he is threatened by injury proximately caused by the defendant.[4] In light of the more demanding standing requirements for treble damage actions standing to sue for injunctive relief will necessarily always be present when there is standing to sue for treble damages.

The Supreme Court has addressed the issue of standing in antitrust actions on only two occasions. The Court briefly discussed the issue in *Perkins v. Standard Oil Co.,* 395 U.S. 642, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969), a case involving alleged price discrimination in violation of Clayton Act § 2, as amended by the Robinson-Patman Act. The Court primarily concerned itself with the Robinson-Patman Act price discrimination questions. The Court, also, addressed the issue of whether Perkins could claim damages for injuries he suffered as an individual because the failing corporations "were unable to pay him agreed brokerage fees for securing gasoline, rental on leases of service stations, and other indebtedness."

---

1. *See, Hawaii v. Standard Oil Co.,* 405 U.S. 251, 262 n. 14, 92 S.Ct. 885, 31 L.Ed.2d 184 (1969); *Jeffrey v. Southwestern Bell,* 518 F.2d 1129, 1131 (5th Cir. 1975).

2. *Id.*

3. *See generally, Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Wright, Miller & Cooper, 13 Federal Practice and Procedure, § 3531 (1975).

4. *Credit Bureau Reports, Inc. v. Retail Credit Co.,* 476 F.2d 989, 992 (5th Cir. 1973).

The Supreme Court noted that the Court of Appeals had denied recovery for these injuries under authority of *Karseal Corp. v. Richfield Oil Corp.*, 221 F.2d 358, 363 (9th Cir. 1955), because "one who is only *incidentally* injured by a violation of the antitrust laws,—the bystander who was hit but not aimed at,—cannot recover against the violator." 395 U.S. at 649, 89 S.Ct. at 1875. The Court, however, reversed because "Perkins was no mere innocent bystander; he was the principal victim of the price discrimination practiced by Standard. Since he was directly injured and was clearly entitled to bring this suit, he was entitled to present evidence of all of his losses to the jury." 395 U.S. at 649–50, 89 S.Ct. at 1875. Thus, the Supreme Court in *Perkins* apparently approved the principle that not all injuries caused by antitrust violations are entitled to remedy by treble damage actions. The language does not, however, set out a clear test to be applied by courts to determine standing.

When the Supreme Court next faced the issue of standing in *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972), it was faced with the rather unique factual situation of a state attempting to sue not only for injuries it endured in its proprietary capacity, but also as *parens patriae* for injuries to its citizens and the economy of the state. The Court observed that the language of Clayton Act § 4 is "notably different from § 16." Observing that the legislative history of the Clayton Act did not shed light on why the "business or property" language was included in § 4 but not in § 16, the Supreme Court, nevertheless, concluded that the language in § 4 was intended to screen out some potential plaintiffs from bringing treble damage actions, even though they could bring suits for injunctive relief. They reasoned that it would make little difference to a defendant whether he was named in one or one hundred suits for injunctive relief, but that it would make an enormous difference whether he was named in one or one hundred treble damage actions.

The Court noted that "the lower courts have been virtually unanimous in concluding that Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." 405 U.S. at 262 n. 14, 92 S.Ct. at 891. The Court went on to conclude that "the words 'business or property,' . . . refer to commercial interests or enterprises," and limited treble damage actions to those types of injuries. Since a *parens patriae* suit was not aimed at remedying injuries to the state's commercial interests or enterprises, the state lacks standing to bring such a suit under the Clayton Act.

■ Read together, *Perkins v. Standard Oil* and *Hawaii v. Standard Oil* establish that the "business or property" language in Clayton Act § 4 limits standing to bring treble damage actions to a class of potential plaintiffs smaller than the class of all persons or entities injured as a result of an antitrust violation. These two cases, however, do not define a workable rule for determining who does have standing. Clearly, the injury must be to commercial interests or enterprises, but *Perkins* suggests that the limitation goes further, that directness of injury is also a consideration. The task has remained for the lower courts to design workable rules for determining what injuries are sufficiently direct.

■ The lower courts have experimented with several different rules for determining whether an injury is sufficiently direct to be remediable by a treble damage action. The rule that has clearly emerged as the majority position, and the position of this circuit, is the "target area" test.[5] As defined in *Jeffrey v. Southwestern Bell*, 518 F.2d 1129, 1131 (5th Cir. 1975), the test limits standing to those persons against whom the conspiracy is aimed. In essence, a plaintiff must show that "he is within that sector of the economy which is endangered by a breakdown of competitive conditions in a particular industry."[6] This test, though easily stated, is difficult to apply.

---

5. *See* American Bar Association, *Antitrust Law Developments* 258–62 (1975).

6. *Battle v. Liberty National Life Insurance Co.*, 493 F.2d 39, 48–49 (5th Cir. 1974).

## II.

The issue presented by the present cases is whether the Seafarers and their members have standing to sue Tugboat, Inc. and Masters, Mates, and Pilots for injuries resulting from the allegedly anti-competitive combination of those groups. To have standing, the Seafarers and their members must prove both that they suffered injury to their "commercial interests or enterprises" and that they were in the target area of the conspiracy.

■ There can be little doubt that an employee who is deprived of a work opportunity has been injured in his "commercial interests or enterprise," because the selling of one's labor is a commercial interest. If this were not the case, courts would have to adopt an across the board rule against employees bringing antitrust actions in any context. Such a sweeping rule clearly is not the law. For example, the Supreme Court in *Radovich v. National Football League*, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957), *sub silentio* approved the standing of a football player to sue the National Football League and the various teams comprising that league to remedy an alleged boycott.

■ The interests of a union in being protected from anticompetitive behavior in situations such as that alleged by Seafarers can clearly be brought within the injury to "commercial interests or enterprises" standard. Unions are in the business of representing employees. If their ability to organize workers is injured by a conspiracy involving employers, the union's ability to attract membership and represent employees is weakened.

[T]here is no reason to exclude the activities of a union from the scope of the word 'business.' A union is an association which is in the business of representing employees, and thereby it obtains proper-

ty, hires officials, etc., and this is so regardless of whether or not it is incorporated.

*Asbestos Workers v. United Contractors Association*, 483 F.2d 384, 394 (3rd Cir. 1973), *modified* 494 F.2d 1353 (1974). *Cf. Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).

■ The key question, therefore, in antitrust actions brought by employees and unions is whether or not the employee and union in the particular case falls within the target area, are "within that sector of the economy which is endangered by a breakdown of competitive conditions in a particular industry." [7] In the *Radovich* case, for example, the employee would fall within the target area, because the alleged boycott was aimed at employees and potential employees of the defendant. In other cases, the employee may fall outside of the target area. If, as in *Reibert v. Atlantic Richfield Co.*, 471 F.2d 727 (10th Cir. 1973), cert. den., 411 U.S. 938, 93 S.Ct. 1900, 36 L.Ed.2d 399, an employee is laid off following a merger, that employee lacks standing to challenge the legality of the merger. This result naturally follows from recognition that the objective in preventing certain mergers is not to prevent employers from taking advantage of economies of scale, but to prevent them from obtaining sufficient market power to raise the prices charged to their customers.[8] Thus, standing by an employee in a particular case depends on whether the employee is within the sector of the economy sought to be protected by banning the type of allegedly illegal behavior involved in the particular case. 471 F.2d at 731–32.

■ If, in the case at hand, the complaints were based merely upon loss of employment opportunity resulting from Mobile Towing's loss of business as a consequence of Tugboat's illegal acts, the Seafarers and their members would lack standing. Reading the complaint broadly, however, as must be done in the context of a motion to dismiss for failure to state a cause of action,[9] the Seafarers and their members

---

**7.** *Id.*

**8.** *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

**9.** *Dailey v. Quality School Plan, Inc.*, 380 F.2d 484, 486 (5th Cir. 1967).

allege that they were also intended victims of the alleged illegal acts. Their allegations that Tugboat conspired with Masters, Mates, and Pilots to reduce labor costs by preventing Seafarers from providing or representing Tugboat's employees is aimed as much at those parties as it is at Mobile Towing.

Nearly identical factual situations were presented the Third and Sixth Circuits in recent cases. In *Asbestos Workers v. United Contractors Association*, 483 F.2d 384 (3rd Cir. 1973), *modified*, 494 F.2d 1353 (1974), and in *Carpenters v. United Contractors Association*, 484 F.2d 119 (6th Cir. 1973), which adopts the Third Circuit decision in an essentially identical situation, several local unions and their members alleged that the defendants Trades and Crafts Union and United Contractors Association had conspired to prevent the plaintiff unions from representing United Contractors' employees by recognizing the Trades and Crafts Union, an organization dominated by members of the Contractors Association who are also members of that union. The Third Circuit, following the lead of the Seventh Circuit in *Nichols v. Spencer International Press, Inc.*, 371 F.2d 332 (7th Cir. 1967), and *Radovich v. National Football League, supra*, held that the loss of employment or the opportunity to be employed could be "an injury to a person's 'business or property,'" 483 F.2d at 394, and, similarly, that the union's claim could be cognizable.

Having concluded that the injuries to the employees [10] and the unions were of a type cognizable in an antitrust action, the Third Circuit went on to consider whether the injuries were within the target area of the anti-competitive behavior. In that case, as in this one, it is easy to identify the union as falling within the target area. The pur-pose of the activities of the Contractors Association was aimed at preventing representation of their employees by the plaintiffs.

The connection of the employees to the case were much more attenuated. The Third Circuit based standing for the union members on the basis that they were employees of the contractors against whom the conspiracy was aimed. Since the contractors lost business, the employees' work opportunities were reduced. They attempted to distinguish this position from that of stockholders, a group previously found to lack standing, on grounds that recovery would not necessarily involve duplication, because allocation would be possible. *Id.* at 397–98. While this distinction may be valid, we do not consider it sufficient grounds for so broad a rule.

Suppliers to the contractors, unlike stockholders, could not be distinguished. Allocation would be possible to provide suppliers with their lost profits without duplicating any damages paid to the contractors. Nevertheless, these damages are too attenuated and do not fit within the proximate damage theory that has been read into the antitrust laws. Such a rule would result in standing for the employees of any business injured by any violation of the antitrust laws. We are unable to agree with so dramatic an expansion in the scope of the antitrust laws. Instead, we adhere to the target area theory. We, nevertheless, do conclude that the employees in this case have standing, not because they suffered injuries as a result of their employer being victimized by violations of the antitrust laws, but because the conspiracy in this case was aimed at the employees as much as it was aimed at the employer.[11] Tugboat, Inc., it is alleged, conspired with Masters, Mates, and Pilots to keep plaintiff union

---

10. The Third Circuit characterized the workers as independent contractors rather than employees. This distinction has no relevance to the question of standing. It is discussed in that opinion only for the purpose of determining the applicability of the labor exemption to the antitrust laws, a question not before us at this time.

11. In *Dailey v. Quality School Plan, Inc.*, 380 F.2d 484, 487 (5th Cir. 1967), this Court indicated in dicta that employees are outside of the target area when the injury is derivative of the injury to the corporation. That ruling is not in conflict with the present case. The injury here is not derivative, it is the direct result of actions aimed at the employees.

employees off of Tugboat, Inc., job sites, necessarily depriving the union member plaintiffs of job opportunities. Since they are in the target area, they may sue.[12]

Accordingly, we reverse and remand these cases for further consideration in light of this opinion.

---

12. Since there is standing to sue for treble damages, standing to sue for injunctive relief necessarily follows.