SACRAMENTO VALLEY CHAPTER OF the NATIONAL ELECTRICAL CONTRACTORS ASSOCIATION (NECA) on behalf of itself, its members and contractors who have signed Letters of Assent or Given Powers of Attorneys to NECA, and all those similarly situated, Plaintiffs,

v.

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS (IBEW)— International Office (I–O), and Local 340 of the IBEW, Defendants.

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL UNION 340, Counter-claimant,

v.

SACRAMENTO VALLEY CHAPTER OF the NATIONAL ELECTRICAL CONTRACTORS ASSOCIATION (NECA); Cyril D. Conzatti, dba Arden Electric; Beard Corporation; Four Star Electric; Grason Electric Company; H & D Electric, Inc.; Rex Moore Electrical Co., Inc.; Myers Electric, Inc.; Harold E. Nutter, Inc.; Amos J. Walker, Inc.; Woodland Electric Co., Inc; and National Association of Independent Unions, Counter-defendants.

Civ. No. S–81–480 LKK.

United States District Court, E.D. California.

April 15, 1986.

Mark R. Thierman, Thierman, Simpson & Cook, San Francisco, Cal., for plaintiff/counter-defendant Sacramento Valley Chapter of Nat. Elec. Contractors Ass'n (NECA).

Robert E. Jesinger, Wylie, Blunt, McBride & Jesinger, San Jose, Cal., for defendant/counter-claimant IBEW Local 340.

Peter Nussbaum, Neyhart, Anderson, Nussbaum, Reilly & Freitas, San Francisco, Cal., for defendant Intern. Broth. of Elec. Workers (IBEW).

Phillip Harris, O. Brandt Caudill, Jr., Maurer, Higginbotham & Harris, Costa Mesa, Cal., for counter-defendant Nat. Ass'n of Independent Unions.

## MEMORANDUM AND ORDER

KARLTON, Chief Judge.

The Sacramento Valley Chapter of the National Electrical Contractors Association (NECA) and several of its employer members (employers) filed a five-count complaint under §§ 301 and 303 of the Labor Management Relations Act (LMRA), 29 U.S.C. §§ 185 and 187, seeking damages from the International Brotherhood of Electrical Workers (IBEW), and its Local

340. In response, Local 340 filed a five-count counterclaim against both the plaintiffs and a separate counter-defendant, the National Association of Independent Unions (NAIU). It alleged violation of §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and seeks damages and injunctive relief for alleged violations of §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

This opinion considers the motion to dismiss the Local's counterclaim. The cross-motions for summary judgment relative to plaintiffs' complaint will be addressed in a separate opinion.

## I

### THE ALLEGATIONS OF THE COUNTERCLAIM

The counterclaim alleges that since 1942 Local 340 and NECA have been parties to successive collective bargaining agreements ("CBA's") or master labor agreements ("MLA's"). Counterclaim at ¶ 8. At the end of February, 1981, Local 340 and NECA commenced negotiations relative to a new MLA to replace the one due to terminate at the end of March, 1981. ¶ 9. Prior to June, 1981, most journeymen and apprentice electricians in the Sacramento area were represented by Local 340 and the prevailing wage rate paid to electricians in the Sacramento area was the rate paid to Local 340 members pursuant to the existing MLA. ¶ 10.

#### A. *First Claim (Conspiracy to Deprive Union Contractors and Union of Business)*

Local 340 alleges that in September, 1981, NECA and its employer members entered into a conspiracy to fix wages and other benefits at levels below those paid by employers who had CBA's with Local 340 and below the market level. ¶ 11. As a result of this conspiracy, the percentage of the electrical construction industry work performed by contractors who had contracts with Local 340 was greatly reduced and Local 340 members lost jobs and benefits. ¶¶ 13–14. In attempting to monopo-lize the electrical contracting market, NECA and the employers "intended to directly reduce the income" of Local 340's members. Local 340 is suing not to recover lost profits to contractors, but only for lost wages and benefits to its members. ¶ 15.[1]

#### B. *Second Claim (Conspiracy to Interfere With Local 340's CBA)*

Local 340's second claim is that NECA, the employers, and NAIU, as early as October, 1981, engaged in a combination or conspiracy to restrain interstate commerce by "coercing, threatening and restraining" individual electrical contractors and employers in the Sacramento area who were outside the NECA–NAIU bargaining unit and who were not bound to the NECA–NAIU contract from (1) entering into CBA's with Local 340, (2) employing electricians represented by Local 340, (3) providing wages, fringe benefits and conditions of employment other than those outlined in the NECA–NAIU agreement, and (4) entering into any CBA except the NECA–NAIU agreement. ¶ 16. As a result of this activity, Local 340 alleges it is and will be irreparably injured in its organizational and representational business activities. ¶ 17. Moreover, Local 340 alleges that this injury was a foreseeable consequence of the antitrust violation purportedly alleged and was specifically intended by the counter-defendants. *Id.*

#### C. *Third Claim (Conspiracy to Eliminate Local 340 as a Competitor in the Market for Labor Union Services)*

Local 340's third claim is that counter-defendants have engaged in a conspiracy to eliminate Local 340 as a competitor in the market for labor union services and for CBA's in the Sacramento area by seeking to prevent Local 340 from representing or organizing the employees of the counter-defendant employers and other employers outside the NECA–NAIU bargaining unit. ¶ 18. As a result, Local 340 has been di-

---

1. The union contractors' injury, while central to an understanding of causation, is not sought to be recovered by this counterclaim nor are any union contractors acting as plaintiffs.

rectly damaged in its loss of work opportunities, loss of revenues and dues, loss of union membership, loss of its share of CBA's, and a loss of bargaining and organizing opportunities in the Sacramento area. ¶ 19.

### D. *Fourth Claim (Conspiracy to Eliminate Non-NECA Contractors)*

Local 340 alleges in the fourth claim that its members compete in the market for electrical construction in the Sacramento area. ¶ 20. By conspiring together to reduce the cost of labor, Local 340 alleges that NECA and the employers acted to drive non-NECA contractors from the electrical contracting industry in Sacramento and, as a result, the percentage of electrical construction work done by contractors who had contracts with Local 340 was greatly reduced. ¶¶ 22–23. Local 340 alleges that NECA and the employers intended to reduce the income of Local 340's members as well as the profit of those contractors who had contracted with Local 340. ¶ 25.

### E. *Fifth Claim (Conspiracy to Deprive Local 340's Members of Jobs)*

The fifth claim alleges that Local 340's members compete in the market for electricians in Sacramento and that the above-described conspiracy deprived these members of jobs, reduced labor costs by preventing Local 340 from representing employees of the counter-defendant employers and resulted in lost jobs to members of Local 340, a result intended by all counter-defendants. ¶¶ 26–28.

## II

### THE APPLICABLE STANDARDS

On a motion to dismiss under Fed.R. Civ.P. 12(b)(6), the allegations of the complaint must be accepted as true. *Cruz v. Beto*, 405 U.S. 319, 322, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972) (per curiam). The court is bound to give the plaintiffs the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *Retail Clerks International Ass'n v. Schermerhorn*, 373 U.S.

746, 753 n. 6, 83 S.Ct. 1461, 1465 n. 5, 10 L.Ed.2d 678 (1963). Thus, the plaintiffs need not necessarily plead a particular fact if that fact is a reasonable inference from facts properly alleged. *See id. See also, Wheeldin v. Wheeler*, 373 U.S. 647, 648, 83 S.Ct. 1441, 1443, 10 L.Ed.2d 605 (1963) (inferring fact from allegations of complaint). In general, the complaint is construed favorably to the pleader. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

So construed, the court may dismiss the complaint for failure to state a claim only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *Hishon v. King & Spalding*, 467 U.S. 69, 104 S.Ct. 2229, 2233, 81 L.Ed.2d 59 (1984), 81 L.Ed.2d 59, 65 (citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)). In spite of the deference the court is bound to give to the plaintiffs' allegations, however, it is not proper for the court to assume that "the Union can prove facts which it has not alleged or that the defendants have violated the ... laws in ways that have not been alleged." *Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519, 526, 103 S.Ct. 897, 902, 74 L.Ed.2d 723 (1983).

## III

### ANTITRUST STANDING

Counter-defendants NECA and the employers (hereinafter "NECA") argue that the first and third claims for relief must be dismissed because the Union lacks "antitrust standing." They also argue that the conduct alleged in all the counterclaims are protected by both the statutory and non-statutory exemption to the antitrust laws. Counter-defendant NAIU argues that all actions against it must be dismissed, first because the Union lacks "antitrust standing," and second, because it is entitled to the statutory and non-statutory labor law exemption. I turn first to the question of antitrust standing.

When Congress in § 303 of the LMRA, 29 U.S.C. § 187, provided that only employ-

ers could sue for tort-type injuries occasioned by unfair labor practices, it created a litigation nightmare for unions. Unions were forced to defend their conduct, without being able to counterclaim relative to the employer's conduct, no matter how egregious.[2] Such a litigation posture exposes only the union to substantial damages and, moreover, reduces the employer's incentive to settlement.[3] In an effort to redress the litigation posture, unions have recently sought to find some ground upon which to cross-complain.[4] Here, the Union seeks to cross-complain under antitrust theories. Such an effort is inevitably met by an assertion that the Union lacks "antitrust standing."

"[A]ntitrust violations are essentially 'tortious acts'." *Associated General Contractors of California, Inc. v. California State Council of Carpenters* ("AGC"), 459 U.S. 519, 547, 103 S.Ct. 897, 913, 74 L.Ed.2d 723 (1983) (Marshall, J., dissenting), *citing Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946). An element of any action in tort is an allegation that the defendant owed a duty to the plaintiff. For reasons

that are not clear to this court, questions of the existence of duty in antitrust cases have been denominated questions of "antitrust standing," rather than simply questions of duty.[5]

For common law courts resolving common-law tort questions, resolution of issues of duty ordinarily turn on a case-by-case analysis of the notions of foreseeability and attenuation. In turn the notion of foreseeability frequently is no more than a surrogate for either explicit or implicit policy decisions, often relating either to "spreading the risk of loss" on the one hand, and "containment of risk" on the other. *See,* W. Prosser, *Law of Torts,* 14–19 (4th ed. 1971).

Examination of duty relative to statutorily created torts would appear to present a different question. Inherent in such a task would appear to be a need to defer to the legislative process where all such questions are appropriately raised and resolved. Thus, for statutorily created torts, one would think that the appropriate source of a determination of duty, and thus in an antitrust case "antitrust standing," would be the statute creating liability.[6] Indeed,

**2.** I do not mean to suggest that an employer's conduct during a strike is irrelevant to its claims under § 303. It may well be that an employer's unfair labor practices contributed to the continuation of the strike, and thus diminishes or defeats its right to compensation. Such issues are not tendered by the present motion, and the court expresses no opinion concerning them. I merely mean to state in the text what is obvious, that the union does not have reciprocal rights under § 303.

**3.** It is common knowledge among trial judges, engaged in the everyday disposition of cases, that nothing aids the settlement process more than when both sides have something to lose; moreover, nothing retards the process more than when one side has nothing to lose.

**4.** *See Butchers' Union, Local No. 498 v. SDC Investment, Inc.,* 627 F.Supp. 650 (E.D.Cal.1986) (RICO claims).

**5.** "Antitrust standing" is, of course, a different question entirely than the question of "standing" in the constitutional sense. *See AGC,* 459 U.S. at 535 n. 31, 103 S.Ct. at 907, n. 31.

**6.** I acknowledge, as I must, that the Supreme Court has explained that in some sense federal courts have a broader interpretive role relative

to the Sherman Act than other legislation. *National Society of Engineers v. United States,* 435 U.S. 679, 688, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978). Nonetheless, whatever power the court has to give shape to the statute, it would not appear to justify the wholesale departure from the statute's language described above. I also acknowledge that the brilliant scholarship of Professor Field's recent law review article suggests that the relegation of common law authority to state courts traditionally understood to have occurred by virtue of *Erie Railroad v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed.2d 1188 (1938), may not be all it is cracked up to be. *See* Field, *Sources of Law: The Scope of Federal Common Law,* 99 Harv.L.Rev. 883 (1986). This is not the place to explore the implications of the article, nor my disagreement with some of the positions adopted by Professor Field. Suffice to say that I am satisfied that under the present law, federal courts do not possess general common law powers, and a federal court interpreting a federal statute, while it employs tools similar to those employed by state courts expounding the state's common law of torts, is proceeding in a functionally distinct manner.

the Supreme Court, in its recent discussion of antitrust standing, purported to proceed in precisely that fashion. Thus the Court acknowledged that in determining who had antitrust standing "[w]e first consider the language in the controlling statute." *AGC*, 459 U.S. at 529, 103 S.Ct. at 903. Candor requires this court to observe that however sympathetic one's reading of *AGC* may be, it is apparent that the Court's invocation of the statutory language was a mere formality, and that the statute's language does not appear to have informed the Court's decision at all. Indeed, the Court itself acknowledged that under its view "the mere fact that the claim is literally encompassed by the Clayton Act does not end the inquiry." *AGC* at 537, 103 S.Ct. at 908.[7]

The statute, in its plain words, defines a defendant's duty in the broadest terms possible. The defendant owes a duty to "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws." 15 U.S.C. § 15. Given the plain meaning of the statute's words it would not appear very difficult for any plaintiff to plead a duty under the Act (i.e., to establish antitrust standing). Indeed, the high Court has acknowledged

that "[a] literal reading of the statute is broad enough to encompass every harm that can be attributed directly or indirectly to the consequences of an antitrust violation." *AGC* at 529, 103 S.Ct. at 903. The federal courts, however, have found such a reading uncomfortable. This discomfort has given rise to a substantial deviation from the statute's provisions.[8]

Based upon its reading of the Sherman Act's legislative history, the Supreme Court has concluded that the plain language of the statute does not mean what it says. This reading, the Court explained, was necessitated by the incongruous effects it believed a reading of the statute literally would engender. Drawing upon its previous citation to a dictum by Justice Brandeis, it argued that " 'restraint is the very essence of every contract; read literally § 1 would outlaw the entire body of private contract law' ..." *AGC* at 531, 103 S.Ct. at 904, *quoting* from *National Society of Engineers v. United States*, 435 U.S. 679, 687–88, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978). Proceeding from this premise, the court then reasoned that a limitation on the language of the statute was required.[9]

---

7. Put another way, the mere fact that the statute provides that a defendant owes a duty to a plaintiff does not end the inquiry as to whether the statute provides that defendant owes a duty to plaintiff.

8. The attitude of the courts towards the language used by Congress may fairly be characterized as brusque. Thus the Ninth Circuit explained "[r]ead literally, this statute could afford relief to all persons whose injuries are casually related to an antitrust violation. Recognizing the nearly limitless possibilities of such an interpretation, however, the judiciary quickly brushed aside this construction." *In re Multidistrict Vehicle Air Pollution*, 481 F.2d 122, 125 (9th Cir.), *cert. denied*, 414 U.S. 1045, 94 S.Ct. 55, 38 L.Ed.2d 336 (1973). Brushing aside a construction is one thing, brushing aside the language employed by Congress is something else entirely.

9. With the greatest of respect I must demur from the premise. However revered the source of the Court's premise, it appears to this district court judge to be fatally flawed. Contracts do not restrain trade, they are the essence of trade.

In the absence of a contract no trade can occur; even barter implicates a contract, although one which is immediately executed. Given my view, the notion that the Sherman Act's plain words cannot be implemented because they lead to an absurd result is just plain wrong. Because the premise is in my opinion wrong, it follows that the reasoning based on the premise is wrong. I do not mean to suggest that no limitations adhere to the statutory formulation, only that such limitations cannot logically be based upon the faulty premise. Indeed, considerations of judicial management, *see e.g., Hanover Shoe, Inc. v. United Shoe Machinery Corp.,* 392 U.S. 481, 492–93, 88 S.Ct. 2224, 2231, 20 L.Ed.2d 1231 (1968), or the danger of double recovery, *see Illinois Brick Co. v. Illinois,* 431 U.S. 720, 746–47, 97 S.Ct. 2061, 2074–75, 52 L.Ed.2d 707 (1977), arguably justify a judicial gloss on the statutory language. *But see* footnote 15, *infra*.

The comments which are found in this footnote, are footnoted because whatever my own views, as I have pointed out before, as a subordinate court, I am obligated to apply the holdings of the Supreme Court, "however misguided." *Harris v. Tomczak,* 94 F.R.D. 687, 698 (E.D.Cal.1982).

Having found the statute an unsatisfactory guide to the scope of the statute's reach, the Court turned to common law doctrines of duty as a means of ascertaining the reach of the statute. When it did so the Supreme Court found, in common with true common law courts, that no bright line divided those injured persons who could sue, those to whom a duty is owed, from those who could not, those to whom no duty is owed. The question of duty under the common law of torts is a label attached at the end of a process of consideration involving questions of policy, practicality, and often inarticulable feelings of fairness.[10] As the debate between Justice Cardozo and Justice Andrews in the famous *Palsgraf* case demonstrated, *Palsgraf v. Long Island R. Co.*, 248 N.Y. 339, 162 N.E. 99 (1928), there is no legally preordained answer to questions of duty; rather judges can do no more than apply generalized criteria to the particular allegations.[11] Not surprisingly, the Supreme Court, given its self-created dilemma, announced that "the infinite variety of claims that may arise make it virtually impossible to announce a black-letter rule that will dictate the result in every case." *AGC* 459 U.S. at 536, 103 S.Ct. at 907.[12] Rather, the Court suggested the employment of "factors that circumscribe and guide the exercise of judgment in deciding whether

the law affords a remedy in specific circumstances." *AGC* at 537, 103 S.Ct. at 908.[13] The Court includes in its non-exclusive list such matters as the causal connection between the antitrust violation and harm, the intention of the defendant, the nature of the injury, i.e., whether it falls within the purpose of Congress in insuring price competition, and directness or indirectness of harm (most easily measured by the presence of others more immediately harmed who could bring the action).

Despite the uncertainty necessarily engendered by the Supreme Court's approach, certain general notions do emerge. Thus the fact that the complained of conduct falls within the literal language of the statute is insufficient to predicate liability in itself, as is the fact that defendant intended the very harm suffered. *AGC* at 537, 103 S.Ct. at 908.[14] More significant for resolution of questions of antitrust standing are unquantifiable inquiries into "directness" versus "indirectness" of injury, *AGC* at 540, 103 S.Ct. at 909, and whether the conduct complained of produces injury adversely affecting the benefits of price competition. *AGC* at 538, 103 S.Ct. at 908. Important also, the Court instructs, is the nature of plaintiff's participation in the relevant marketplace, with consumers or competitors being more likely

---

**10.** Such considerations are, of course, wholly appropriate to state courts interpreting common law torts, since as common law courts, they have a general law-making function. Whether such considerations are appropriate to federal courts purportedly interpreting a federal statute seems quite another question.

**11.** Duty is a question of law and thus must be decided by the judge who cannot leave it to the jury. *Bubar v. Ampco Foods, Inc.*, 752 F.2d 445, 449 (9th Cir.), *cert. denied*, — U.S. —, 105 S.Ct. 3481, 87 L.Ed.2d 616 (1985).

**12.** In effect, the Court rejected the idea that question of duty can be resolved by a traditional definition. See this court's extensive discussion of the character of definitions and their use in the law in *Harris v. Tomczak*, 94 F.R.D. 687, 697–99 (E.D.Cal.1982).

**13.** Such criteria are frequently described by contemporary linguistic philosophers as indicia of "familial" relationships. *See Ortiz v. Bank of America*, 547 F.Supp. 550, 568 n. 27 (E.D.Cal. 1982). Because such nonexclusive criteria are an unfamiliar tool in Anglo-American law, the Court's disavowal of a definitional mode has not been a particularly successful technique for providing guidance to the lower courts who must apply the law on a day-to-day basis. *Cf. Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282, 1295 (9th Cir.), *cert. denied*, — U.S. —, 105 S.Ct. 963, 83 L.Ed.2d 968 (1985) (six "factors"); and *Bubar v. Ampco Foods, Inc.*, 752 F.2d 445, 449 (9th Cir.), *cert. denied*, — U.S. —, 105 S.Ct. 3481, 87 L.Ed.2d 616 (1985) (five "factors").

**14.** Justice Marshall in his dissent to *AGC* takes the majority to task for its failure to correctly evaluate the effect of intent in the law of torts. No purpose would be served in repeating his analysis.

The essence of the Union's first, second, and fourth causes of action are that NECA, the employers, and the NAIU conspired to achieve the very harm the Local suffered.

to having standing than others not so situated. Perhaps most pertinent relative to the instant motion was the Court's apparent position that various statutes potentially governing the same conduct do not necessarily provide cumulative remedies, especially in the labor and antitrust fields. As the Court explained, taken together, the considerations articulated in *AGC* most often result in a union, in its representative capacity, being denied antitrust standing in cases where the relevant market is the employer's field of endeavor. That is, because of the general position of unions vis-a-vis the relevant market (ordinarily unions will be neither competitors nor consumers), and because a union's interests are frequently unsympathetic to the purposes of the antitrust laws (unions' goals of stable working conditions and wages are generally "harmed by uninhibited competition among employers", *AGC* at 539, 103 S.Ct. at 909), and because of the existence of "a separate body of labor law," *AGC* at 539-40, 103 S.Ct. at 909, "a union, in its capacity as bargaining representative, will frequently not be part of the class the Sherman Act was designed to protect, especially in disputes with employers with whom it bargains." *AGC* at 540, 103 S.Ct. at 909.

■ With the general principles noted above in mind, resolution of the questions tendered by counter-defendants' motion attacking certain of Local 340's causes of action appear relatively clear. Thus the Union's first and fourth causes of action in essence attack counter-defendants' conduct vis-a-vis Union contractors or non-NECA contractors. Local 340's damages are wholly derivative of and consequential to the injuries sustained by those contractors. While the Union disavows any effort to seek damages from the counter-defendants caused to such employers (see footnote 2, *supra* ), that appears beside the point. Under *AGC*, the damages the Union complains of are characterized under *AGC*'s formulation as indirect, and as such are insufficient to sustain the Union's "antitrust standing." [15] That is particularly so since under *AGC*, the Union's allegations of intentional harm are insufficient to sustain its standing. Finally, I note that under *AGC*'s analysis, the relevant market as to both the first and fourth causes of action is the market for contractor services, and as to these markets, the Union is neither a competitor nor a consumer.

Under all of the circumstances noted above, it appears to this court that the first and fourth causes of action of the counterclaim must be dismissed because the Union has no standing relative to the violations alleged therein.

■ The second cause of action essentially is subject to the same analysis as the first and fourth causes of action. Perhaps more serious, however, is the fact that it is not at all clear that it states an antitrust violation. The essence of that cause of action is that the counter-defendants conspired and acted to prevent contractors

---

**15.** In footnote 9 above, I observed that the general reason the statutory language of the Sherman Act has been ignored was, in my opinion, based on a faulty premise. The particular need to limit standing to those directly injured derives from another set of reasons, which I respectfully suggest also do not bear up well under analysis. In this regard, the Court quoted with approval from a dissent by Justice Brennan that " '[a]n antitrust violation may be expected to cause ripples of harm to flow through the Nation's economy; but "despite the broad wording of section 4 there is a point by and which the wrongdoer should not be held liable." ' " *AGC* at 534, 103 S.Ct. at 906, *quoting Blue Shield of Virginia, Inc. v. McCready*, 457 U.S. 465, 476-77, 102 S.Ct. 2540, 2546-47, 73 L.Ed.2d 149 (1982), *quoting Illinois Brick Co. v.*

*Illinois*, 431 U.S. at 760, 97 S.Ct. at 2082 (Brennan, J., dissenting). This frank appeal to policy seems out of place in interpreting a statute whose meaning seems perfectly clear. If indeed there is a point at which liability ought to be limited, that appears to be precisely the kind of line-drawing that Congress is best equipped to engage in. Nor is it apparent to me why ripples of injury should not occasion ripples of compensation. I recognize the wisdom of Justice Brennan's argument, and indeed he is correct that considerations of judicial management inform questions of duty at the common law, *see* Prosser, *Law of Torts*, (4th Ed.1971) Chap. 7. Nonetheless, I reiterate, this is a statute that is being interpreted, and the court is simply not free to rewrite the statute to conform to its notions of what Congress should have done.

from entering into CBA's with Local 340. These allegations appear to be no more than labor law violations dressed up as antitrust causes of action. As such, it seems doubtful that they can be sustained.[16] This result is clearly dictated by *AGC.* 459 U.S. at 527, 103 S.Ct. at 902 ("charge that the defendants 'advocated, encouraged, induced, and aided nonmembers ... to refuse to enter into collective bargaining relationships' with the Union [as alleged in the complaint] does not describe an antitrust violation.").

■ The fifth cause of action seems equally vulnerable to an attack both on standing grounds and on the grounds that it fails to state a cause of action. As to standing, it is true that an employee who loses his job because of a refusal to participate in Sherman Act violations, both has standing and states a cause of action. *Ostrofe v. H.S. Crocker Co., Inc.,* 740 F.2d 739, 742–43 (9th Cir.1984), *cert. dismissed,* — U.S. —, 105 S.Ct. 1155, 84 L.Ed.2d 309 (1985). Such, however, is not the allegation here. Rather, the allegation is simply that Local 340's members lost work because of the antitrust violation. Given *AGC's* analysis, such claims are too remote and speculative to sustain standing, especially in light of the fact that the workers, for these purposes, are neither participants nor consumers in the contractors' market. *See Conference of Studio Unions v. Loew's, Inc.,* 193 F.2d 51 (9th Cir.1951), *cert. denied,* 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1952).

■ All of the above leaves Local 340 with its third cause of action, premised on the existence of a market for labor union services in which its competitive position was adversely affected by the antitrust violations engaged in by the counter-defendants. The Union's theory of liability finds direct support in two out-of-circuit cases. *Tugboat, Inc. v. Mobile Towing Co.,* 534 F.2d 1172, 1176–77 (5th Cir.1976); *International Ass'n of Heat & Frost Insulators and Asbestos Workers v. United Contractor's Ass'n of Pittsburgh, Pa.,* 483 F.2d 384, 396–98 (3rd Cir.1973). *Tugboat's* recognition of potential antitrust liability for interference with the market for labor union services may have been approved of by the Ninth Circuit in a pre-*AGC* case. *See Lucas v. Bechtel Corp.,* 633 F.2d 757, 760 (9th Cir.1980).

The first question which must be considered as to the third cause of action is whether, by virtue of *Lucas,* I am bound by the holding in *Tugboat.* I believe that I am not. First, as I explain below, *Lucas* is directly distinguishable from the instant issue (although *Tugboat* is not); and second, *AGC* has completely undermined both the rationale and holding of *Tugboat. See LeVick v. Skaggs Companies, Inc.,* 701 F.2d 777, 778 (9th Cir.1983); *Heath v. Cleary,* 708 F.2d 1376, 1378 n. 2 (9th Cir. 1983); *Sierra Club v. Watt,* 608 F.Supp. 305, 337 (E.D.Cal.1985).

Although the facts in *Lucas* are somewhat obscure, it appears that there a local union, on behalf of its members, sought recovery from Bechtel Construction Company under the antitrust laws because its members were paid lower wages than those paid locally, pursuant to a national "stabilization agreement" negotiated between Bechtel and the International. Although the relationship of such a claim to the antitrust laws is, to say the least, remote, the plaintiff union alleged that the "payment of lower wages was in furtherance of a conspiracy to enable the Bechtel companies to monopolize the market for design and construction of nuclear power plants." *Lucas* at 758. The court of appeals acknowledged that "[i]mporting an antitrust claim in the situation here may indeed seem questionable," but given that an "[e]ffect on commercial competition is alleged .... it cannot be said that plaintiffs could not prove injury to their 'business or property' 'by reason of anything forbidden in the antitrust laws.'" *Id.* at 760.

---

**16.** Because I believe that as to the second and fifth causes of action *AGC* compels a finding of lack of "antitrust standing," I refrain from an extended analysis of the effect of the labor exemption upon the claims.

That *Lucas* is distinguishable from the instant case seems relatively clear. There, the relevant market was the one engaged in commercially by the employer—the design and construction of nuclear power plants—while here the issue is a purported market in labor union services. Because, as discussed above, the relationship of plaintiff to the pertinent market is critical, the distinction is critical to an evaluation of the binding character of *Lucas* to the matter at bar.[17]

Moreover, it is clear that *AGC* completely undermines the premise of *Lucas*. Given the relevant market, under *AGC*, the union in *Lucas* did not have antitrust standing precisely for the reasons that Local 340 does not have standing here for the claims embodied in the first and fourth causes of action. Thus unconstrained by *Lucas*, I turn to the question of whether Local 340 has standing as a matter of first impression in this circuit.

I begin by acknowledging that *AGC* is not directly dispositive of the issue. The Supreme Court noted that the plaintiffs there did "not allege any restraint on competition in the market for union services. Unlike [*Tugboat* and *Heat & Frost Insulators*] in this case there is no claim that competition between rival unions has been injured or even that rival unions exist." *AGC*, 459 U.S. at 527 n. 14, 103 S.Ct. at 903 n. 14. *AGC*, then, left open the possibility that such an allegation would suffice to provide "antitrust standing." Nonetheless, as I have noted, the Court did admonish that "a union, in its capacity as bargaining representative, will frequently not be part of the class the Sherman Act was designed to protect, especially in disputes with employers with whom it bargains." *AGC* at 540, 103 S.Ct. at 909. This admonition, however, like the case itself is again not

dispositive, since here, in addition to the employer the union seeks to sue an alleged "yellow dog" union,[18] and alleges a conspiracy between the employer and the rival union. Nonetheless, I note that the high Court's conclusion was premised on the existence of "a separate body of labor law designed to protect and encourage the organizational and representational activities of labor unions." *AGC* at 539–40, 103 S.Ct. at 909. Because the labor laws are also designed to insure the independence of unions from company control, 29 U.S.C. § 158(a)(2), that factor also suggests a lack of antitrust standing in the instant case. Put another and perhaps more precise way, given *AGC*'s views that the antitrust and labor laws do not provide cumulative remedies, the existence of the rights of workers to organize free of company coercion under the labor laws suggests that no duty is owed by the employers and rival unions to a plaintiff union under the Sherman Act. As the Court explained, the case-by-case analysis mandated by *AGC* requires a close examination of whether the plaintiffs' "alleged injury ... is of the type that the antitrust statute was intended to forestall." *AGC* at 540, 103 S.Ct. at 909. It appears to this court that an analysis of that crucial factor requires dismissal of Local 340's third counterclaim.

I begin, as I must, with the words of the statute. The statute makes defendants liable for injuries to a plaintiff's "business or property." 15 U.S.C. § 15. Although, as I recognized above, the courts have determined that Congress didn't mean what it said, it nonetheless appears appropriate in resolving the issue tendered to this court to ask whether a union engages in business or has its property injured for purposes of the Sherman Act, when an employer conspires

**17.** As the Supreme Court explained, "our prior cases have emphasized the central interest [of the antitrust laws] in protecting the economic freedom of participants in the relevant market." *AGC* at 538, 103 S.Ct. at 908.

**18.** It occurs to this writer that we have so lost our history that this reference may be obscure, particularly to readers whose interest is antitrust rather than labor-oriented. Traditionally,

"yellow dog" contracts were contracts in which a worker disavowed membership in and agreed not to join a labor union during the period of employment. Webster's *Third New International Dictionary* (1966). Thus contracts entered into between employers and company-dominated unions also came to be known as "yellow dog" contracts with a "yellow dog" union. Morris, *The Developing Labor Law*, at 14, 23, and 1361 (2nd ed. 1983).

with a rival union to injure the union's ability to organize the employer's workers.[19] Put another way, is the interest of a union in organizing workers an interest of the type that the Sherman Act was designed to protect? Both the Fifth and Third Circuits had no difficulty with the question. Relying on what appeared to both circuits to be the self-evident proposition that unions are "in the business" of representing employees, *Tugboat*, 534 F.2d at 1176; *Heat & Frost*, 483 F.2d at 394, neither court found any difficulty in concluding that "anticompetitive" activity by employers and rival unions fell within the prohibition of the Sherman Act. That proposition, however, is not self-evident to this court. Indeed, it does not appear to this court that unions are in business in any ordinary sense of the word. On the contrary, unions are organizations of the workers themselves, who under the aegis of the NLRA have banded together for the purpose of *self-representation*.[20] As I try to explain below, whatever the outer reaches of the word "business", as a matter of ordinary usage,[21] it would not encompass self-representation. Neither profit nor capital accumulation is sought by a union in its representational capacity. In the absence of either a profit motive, or at least the aim of acquiring capital, it is difficult to see what indicia of a business is possessed by a union in its representational capacity.[22]

As the Labor Act explains, among its purposes as a "declared ... policy of the United States," is "encouraging the practice and procedure of collective bargaining and by protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." 29 U.S.C. § 151. I hardly know how entities created for such purposes can be said to be in business—in any ordinary meaning of that word. Moreover, Congress in the Clayton Act itself attempted to make clear the law on this issue. The national legislature has declared in providing an exemption to the antitrust laws for labor unions, that "[t]he labor of a human being is not a commodity or article of commerce." 15 U.S.C. § 17. Because the function of unions is to represent the conditions under which human beings labor, it appears to this court that by virtue of the statute a union in its representational function cannot be viewed as dealing in a "commodity or article of commerce," i.e., they are not in business.[23]

■ *Tugboat* acknowledges that the sweep of the antitrust laws, while broad, is restricted to "commercial transactions." *Tugboat*, 534 F.2d at 1176. Nonetheless, both it and *Heat & Frost*, relying on *Radovich v. National Football League*, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957) note that employees may, under certain circumstances have an antitrust claim, and thus conclude that unions have antitrust standing. I cannot agree. The *Tugboat* court explained that in *Radovich* the Supreme Court "*sub silentio* approved the standing

---

**19.** I stress here that the question is not whether the law ought to provide tort relief for such conduct, a question for Congress, but whether the Sherman Act does so.

**20.** "The term 'labor organization' means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." 29 U.S.C. § 152(5).

**21.** "A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. U.S.*, 444

U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979); *Richards v. Nielsen Freight Lines*, 602 F.Supp. 1224, 1243 n. 31 (E.D.Cal.1985).

**22.** It is of course true that many unions hire employees and purchase supplies. Such activities are, however, not obvious indicia of being in business; the United States Government and church congregations do both, but neither are in business when acting as a government or a church.

**23.** Of course, a union engages in business when it acts as a consumer, or for instance, when it assumes an equity position in a company. These issues are not tendered in the case at bar.

of a football player to sue the National Football League and the various teams comprising that league to remedy an alleged boycott." *Tugboat*, 534 F.2d at 1176. In light of recent pronouncements by the Supreme Court as to how to read its cases, that proposition must be held to be substantially in doubt.[24] More directly, however, as the Ninth Circuit has recently demonstrated, claims made by individual employees concerning the effect of a group boycott by employers, where the boycott was used as a tool of enforcing antitrust activity in a commercial (as contrasted with labor) market may well provide the employee with standing under *AGC*. *Ostrofe v. H.S. Crocker Co., Inc.*, 740 F.2d 739 (9th Cir.1984).[25] Thus, because I find *Radovich* tendered a different question, I do not find *Tugboat* and *Heat & Frost*'s reliance on *Radovich* persuasive.[26] On the contrary, because I find that unions, in their representative capacity, are not in business for purposes of the Sherman Act, I find that rival unions and employers have no duties relative to unions under the Sherman Act, and thus conclude that Local 340 does not have standing as to its third cause of action. Accordingly, under facts such as

those alleged in Local 340's third cause of action, unions are left to such remedies as may be provided by the NLRB.[27]

For all of the above reasons, IT IS HEREBY ORDERED:

1. That Local 340's cross-complaint is DISMISSED in its entirety;

2. Because the basis for dismissal are purely legal, it is apparent that amendment of the complaint would be futile and accordingly the dismissal is with prejudice;

3. Because no just reason for delay exists, the clerk is directed to enter judgment; *see* Fed.R.Civ.P. 54(b).[28]

IT IS SO ORDERED.

**24.** As I have noted "[u]nder rather stringent standards recently announced by the Supreme Court, where an issue was not [directly] addressed, a court cannot assume it was implicitly decided." *Fuller v. United States*, 615 F.Supp. 1054, 1060 (E.D.Cal.1985), *citing Pennhurst State School & Hospital v. Haldeman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (even questions of subject matter jurisdiction are open until specifically addressed). The impact of *Pennhurst* on conventional legal reasoning is quite severe, and I suspect not yet fully appreciated. Perhaps in the near future the Court will explain that it was merely speaking about its evaluation of its own cases, and that lower courts are to continue to reason about its decisions in a more traditional way. Certainly, however, nothing in *Pennhurst* itself suggests this or any other limitation.

**25.** As the Ninth Circuit explained, employees like *Ostrofe* or *Radovich* are in a position much more analogous to the consumer in *Blue Shield of Virginia, Inc. v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), than a union's position in *AGC*. In such situations, plaintiffs harm is occasioned by conduct designed to en-

force antitrust activity in the commercial market (in *Ostrofe* printing; in *Radovich* football), where here, as in *Tugboat* and *Heat & Frost*, the focus is on the labor market.

**26.** For the same reason, I do not find *Ostrofe* requires this court to find that Local 340 has standing as to its third cause of action.

**27.** If anybody cares, I think this is a most unfortunate state of the law. Let me hasten to add that my view has nothing to do with the antitrust laws, but rather is predicated upon the union's lack of a tort remedy for employer misconduct in its relations with unions. The country would be far better off if either both parties were required to resort to the board, or both had tort remedies. The present condition encourages both employer misconduct and protracted litigation. In my view, however, these are considerations for the Congress, and not the courts.

**28.** By virtue of this Order, the Union may appeal now rather than awaiting disposition of the balance of the case.